UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CASE NO. 23-CR-71 (RDM) |
| v. | : | |
| | : | |
| BRYAN SHAWN SMITH, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S OPPOSITION TO
DEFENDANT'S MOTION TO CONTINUE**

The Court should deny the defendant's last-minute attempt to continue trial. The defendant proffers three separate basis, each unwarranted and discussed individually below, to continue this case—again—on the eve of trial. The Court should see the defendant's request for what it is: a final, desperate attempt to stop this case from proceeding. Accordingly, balancing the interests here, the Court should deny the defendant's motion and retain the current trial date.

**Relevant Factual & Procedural Background**

The FBI arrested the defendant in Huntsville, Alabama on December 13, 2022. (ECF No. 5). Shortly thereafter, the defendant retained Mr. Aubrey Webb of Coral Gables, Florida who entered a notice of appearance in the case on December 19, 2022. (ECF No. 6)

The Court arraigned the defendant on the original indictment on March 9, 2023. (Minute Entry, March 11, 2023) During a subsequent status conference on March 27, 2023, this Court scheduled jury selection and trial to commence on November 6, 2023. (Minute entry, March 27, 2023). The government provided the defense the case specific discovery more than a year ago.

On September 25, 2023, six weeks prior to the scheduled trial date, Mr. Webb filed a motion to withdraw from the case. (ECF No. 29.) In response, this Court set a *Faretta* hearing for October 11, 2023. (Minute Entry, October 2, 2023.) The Court granted Mr. Webb's request to

1

withdrawal, permitted the defendant to proceed pro se, and appointed standby counsel to assist the defendant as the case progressed. (Minute Entry, October 11, 2023) In the same order, the Court vacated the November 6, 2023, trial date and scheduled a status conference for November 14, 2023. On November 14, 2023, the Court held a status conference where the Court rescheduled trial for April 5, 2024, and set multiple deadlines for the parties based on the new trial date. (Minute Entry, November 14, 2023).

On March 28 and 29, 2024, nearly a week before the trial was scheduled to commence, three defense attorneys, from two different law firms, filed notices of appearances in this case. (ECF No. 48 and 49) At a status conference on April 2, 2024, the Court granted the defendant's request to withdraw his pro se status and allowed the defendant to retain Messrs. Pierce, Roots, and Sabatini. (Minute Entry, April 2, 2024). At the same hearing, the Court continued the trial to May 6, 2024, and set a deadline for the defendant to file anything supplemental by April 16, 2024.

On April 17, 2024, the government notified the defendant that the FBI procured the same – or a substantially similar – stun gun that the defendant possessed at the U.S. Capitol.[1] The FBI procured the device based on a review of the available evidence in this case, including all discovery previously provided to the defendant. The government advised the defendant that the government intended to mark the stun gun as an exhibit for use at trial and it would be available for the defense's inspection prior to trial. Immediately thereafter, on April 18 and 19, 2024, the government provided the defendant with all the discovery associated with the exhibit, including relevant photographs and FBI 302's.

---

[1] The case specific discovery included an expert report by Dr. Mark Kroll, a defense expert who testified used in *U.S. v. Vitali GossJankowski*, 21-cr-123-(PLF) regarding a stun gun's capacity to be a "dangerous and deadly weapon." Dr. Kroll's report included a conclusion about the specific make and model of the stun gun the defendant brought to the Capitol on January 6, 2021, which was the stun gun used by GossJankowski.

On April 17, 2024, the day after the motions deadline, and in response to the government's request for defendant's witness and exhibit lists, Emily Lambert advised the government that her home burned down. On April 18, 2024, the defendant asked the government if the government would agree to a continuance based on these events. The government advised the defendant it would object to any continuance.

At no time during the pendency of these proceedings, including in recent weeks, has the defendant ever indicated he suffered medical issues related to his ability to sit for trial.

## ARGUMENT

I. **A continuance based on a paralegals unavailability for trial is an unprecedented remedy for this Court.**

While Ms. Lambert's current situation is deeply unfortunate, it strains credulity, and is frankly unprecedented, for the defendant to argue he is unable to proceed to trial based on the availability of support staff.

To begin, the defendant mischaracterizes and overstates Ms. Lambert's role in this trial. The defendant represents to the Court that, "Ms. Lambert had extensively prepared and planned for months to execute this role during this trial." (ECF 67 at 1). Unless the defendant hired Messrs. Pierce and Roots months ago—which would undercut his arguments and representations to the Court about his desire to withdraw his pro se status and retain counsel on April 2, 2024—Ms. Lambert has only been involved in this case for a few weeks. And the defendant offers no explanation as to why he waited a week after notifying the government on April 17, 2024, to file the present motion. If the defendant was so prejudiced by Ms. Lambert's absence, and she is a "necessary component of the defense team" as they allege, the defendant should have acted with urgency to bring this to the Court's attention.

3

Nonetheless, Ms. Lambert is not the only person who can "keep the ship afloat" in the colloquial sense. The defendant has three defense attorneys from two different firms. All three attorneys have experience trying January 6 cases in the District Court for the District of Columbia. Messrs. Pierce and Roots do not solely rely on the skills and experience of Ms. Lambert. Among other employees, John Pierce advertises four law clerks employed by his firm.[2] Any one of these clerks can step in and support this case for trial. Mr. Sabatini advertises support staff that are an "integral part of our firm and play[] a critical role in ensuring that our attorneys can focus on what they do best: fighting for our clients."[3]  Surely, these three experienced litigators—with the other support staff they employ—have the bandwidth and aptitude to manage trial preparation, discovery, and courtroom technology in Ms. Lambert's absence. It cannot be that none of these individuals have the "skills and computer capabilities of managing the audio and visual exhibits during the trial."

And, if all three defense attorneys and all their support staff are somehow incapable of filling in for Ms. Lambert, the government has paralegals at the ready to assist the defense. Government paralegals have routinely assisted defense manage trial exhibits, and play videos exhibits, at trial in January 6 cases. This case is no different and the government is happy to provide these resources to the defendant.

## II.    The defendant's medical issues are a pretext to avoid trial.

The defendant claims that, on the eve of trial, he has succumbed to a medical condition so severe that it impairs his ability to sit for trial. The defendant refers to his Cellulitis ailment as "ongoing" (ECF 67 at 2). Yet, in the more than 16 months since the defendant was first indicted,

---

[2] *See* https://www.johnpiercelaw.com/team-2
[3] *See* https://sabatinilawpa.com/support-staff/

4

this is the first time he has brought this condition to the Court's attention. Two prior trial dates were set while the defendant was pro se and he never mentioned having any difficulty sitting or traveling for those trial dates. The defendant travelled to D.C., sat in a courtroom, and travelled home for the status conference on April 2, 2024, without incident.

Given the alleged gravity of the defendant's medical condition, the Court should expect more than a five sentence, undated note from a medical provider. Cellulitis is curable with antibiotics. Nonetheless, the defendant alleges he has been seen in emergency rooms; followed up with his regular physicians; was prescribed antibiotics; and admitted to the hospital a second time. All this documentation, if it exists, is available to the defendant. But he has presented none of it to this Court. The Court should not take this superficial claim at face value.[4]

### III.    Pretrial litigation is not a reason to grant a continuance.

The defense claims the rigors of pretrial litigation to support their continuance request. This claim should be denied.

The defendant advances two reasons to support his request for a continuance due to pretrial litigation. First, he claims that "[t]here are additional motions in limine, and oppositions, which are also pending and developing. This pretrial motion practice seems to require additional pretrial time, and thus an extension and continuance of trial." (ECF 67 at 3) But at the April 2, 2024, status conference, the Court advised that—aside from the superseding indictment—the time for motions practice had long passed. The defendant does not even acknowledge this clear instruction from the Court, much less attempt to engage with it. He does not specify what sort of motions he might file, or why they "seem[] to require additional pretrial time," *id.*, nor does he ask the Court for an

---

[4] Additionally, the other factual inaccuracies and misrepresentations in the defendant's motion should persuade the Court to demand more concrete evidence before making any finding about the defendant's medical condition and ability to sit for trial.

extension of time or leave to file motions which would otherwise be time-barred. (*See*, *e.g.*, ECF 70). The Court should deny this argument out of hand.

Second, the defendant claims that, although it has not yet provided expert notice, the government plans to present expert testimony about the stun gun that he brought to the Capitol and passed to another rioter. To advance this argument, the defendant mischaracterizes the government's evidence and the discovery to which he has access. At trial, the government will move to admit a stun gun of the same, or substantially similar, make and model as the stun gun that the defendant brough to the Capitol on January 6, 2021. This does not require expert testimony, nor does the government intend to elicit any. The government will simply authenticate the stun gun like any other piece of evidence. The government will move to admit it through the case agent. To satisfy the low bar of authenticity, Fed R. Evid. 901, the agent will testify how he determined the stun gun at trial was the stun gun in this case. This will include his review of video footage of the stun gun, research he conducted, and testimony he reviewed from defense expert Dr. Mark Kroll in *United States v. Vitali Gossjankowski*, 21-cr-123-(PLF), Trial Tr. at 1247, which was about the same stun gun. Once the agent determined the make and model of the stun gun based on this investigative work, he purchased this device for use as a demonstrative exhibit in this case.

Despite the defendant's representation, he is not entitled to a delay to seek an expert witness because no expert is necessary in this case. The government will not seek testimony concerning the device's capacity to cause bodily injury or its characterization as a dangerous or deadly weapon.[5] The demonstrative exhibit will help the factfinder understand the device the defendant brought to the Capitol; provide context to the other evidence the government will present

---

[5] As part of a motion *in limine*, the government requested the Court limit defense efforts to disprove that stun gun is a dangerous or deadly weapon because that is not an element of the charges in the superseding indictment. (ECF No. 64)

6

concerning the defendant's actions and the stun gun's use; and prevent the defendant from mischaracterizing the device at trial as he has done in his pleadings. Any objection to the government's evidence should be the subject of a motion *in limine*, not a motion to continue.

It is concerning that the defendant attempts to plead surprise in an effort to portray the government's recent communications about the stun gun exhibit as some type of evidentiary ambush that now warrants a continuance. The defendant has known of Dr. Kroll's expert report. The defendant received it in discovery over a year ago. And although they are new to the case, these defense counsel appear to be well aware of Dr. Kroll's testimony, because the assertion that the stun gun was a "toy" appears to have come from him. *United States v. Vitali Gossjankowski*, 21-cr-123-(PLF), Trial Tr. at 1379. Dr. Kroll also appears on the defendant's witness list provided to the government on April 22, 2024. Dr. Kroll's conclusions as to the specific make and model of the stun gun the defendant brought to the Capitol is no secret, and the government's decision to present evidence about the stun gun does not justify another delay of the trial.

**CONCLUSION**

For the foregoing reasons, the Court should deny the defendant's motion to continue trial.

        Respectfully submitted,

        MATTHEW M. GRAVES
        United States Attorney
        D.C. Bar No. 481052

By:    /s/ *Eli J. Ross*
        Eli Ross
        Assistant United States Attorney
        IL Bar No. 6321411
        U.S. Attorney's Office for the District of Columbia
        601 D Street, N.W.
        Washington, D.C. 20530
        Phone: (202) 297-1515
        Email: Eli.Ross@usdoj.gov

        /s/ *Sara Levine*
        Sara E. Levine
        Assistant United States Attorney
        VA Bar No. 98972
        U.S. Attorney's Office for the District of Columbia
        601 D Street, N.W.
        Washington, D.C. 20530
        Phone: (202) 252-1793
        Email: Sara.Levine@usdoj.gov