UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA :**

        v.                      :                23-CR-71 (RDM)

**BRYAN SMITH**               :

**DEFENDANT'S MOTION FOR RECONSIDERATION OF
ORDER OF DETENTION PENDING SENTENCING**

Mr. Smith, through undersigned counsel, respectfully moves this Honorable Court to reconsider its order of detention issued on May 31, 2024, following a hearing held that same day.[1] Mr. Smith requests that his prior bond conditions be reimposed pending his sentencing. He asks that the Court allow him to leave his home for medical, legal and church activities as well as to work. He has been offered employment as noted in the attached letter. (Exh. 4)

Mr. Smith was arrested in Alabama on December 13, 2022, and had his first appearance in this jurisdiction on December 20, 2022. He was released on conditions pending trial. See ECF 8. He was compliant with his release conditions throughout his pretrial proceedings. See ECF 12, 18, 19, 30, 35, 44, 54, 75. He opted to proceed with a bench trial, which commenced on May 6, 2024, and concluded on May 10, 2024. The government did not proceed on the 111(b) charge or on the theory that the 111(a) charged involved bodily contact. See Minute Order of 5/2/2024; Tr. 5/10 at ECF 88, p. 63. This Court rendered a guilty verdict on Counts 1, 2, 3, 4, 5, and 7, and a not guilty verdict on Count 6. See Minute Order of 5/10/2024; Transcript, ECF 88. The

---

[1] Counsel has reviewed the transcript of the May 10, 2024 hearing in preparing this motion but has been unable to obtain the May 31 transcript at the time of filing this motion. As the Court is aware, Counsel was not at that hearing and thus is somewhat hampered in reporting what occurred.

government sought remand after the verdict, but the Court denied that request and instead ordered him released on home incarceration. See ECF 87; Tr. at ECF 88.

In requesting detention after the verdict was rendered on May 10, the government first argued that Mr. Smith had been "unresponsive" to the government and to a Court order in March. As the Court noted, Mr. Smith was ill at the time. Then the government pivoted to an argument that

> at the time Mr. Smith was ordered to self report to the FBI, when it was originally -- when he was originally arrested, the FBI surveillance team outside of Mr. Smith's house observed Mr. Smith and his wife piling what seemed to be luggage or bags into the truck. Mr. Smith then went around northern Alabama, Huntsville area, did not go directly to the FBI office that he was supposed to go to. It was only after the FBI engaged his attorney at the time that he did go to an FBI office. From my understanding, he didn't actually go there and the FBI arrested him.

Tr. 5/10, ECF 88, p. 105.  When the Court inquired of the agent, he said more than an hour passed between the time he had agreed to arrive at the FBI office and when he arrived. But, as then counsel pointed out, he was detained directly outside the FBI building, clearly not trying to flee. *Id* at 108.  Then counsel pointed out that Mr. Smith had been compliant with his release conditions for two years, never missed a hearing and lives in Huntsville with his wife and children.

Weighing these factors, the Court released him saying "I am going to order that he be placed on home incarceration with a monitoring device." ECF 88, Tr. of 5/10) The Court ordered him to report to pretrial services the following Monday, which he promptly did. The Court advised Mr. Smith that he "cannot leave the home for any purpose without prior authorization from the Court." Mr. Roots asked for permission for Mr. Smith to leave his home for work and the Court responded

> [l]et's do this initially. And if he can work out a plan . . . that is acceptable to the Pretrial Services officer, you can come back to me and say, this is our plan and agreement, he

2

would leave the house during these hours to go to work, this is where he would travel. This is what he would be allowed to do. And then you can bring that back to me once we have a chance to hear from Pretrial Services and the government can respond to that as well.

Tr. 5/10/2024, ECF 88, p. 111-112. At this time Court took a recess (at 4:59 p.m. according to the transcript) and some members of the defense trial team and Mr. Smith briefly left the courtroom to go to the attorney lounge. When they returned, the Courtroom Deputy advised Mr. Smith on the record that if he needed modifications, his attorneys could request those modifications from the Court. According to the transcript, the proceedings were completed at 5:14 p.m. When Mr. Smith relayed that he believed a discussion ensured while he was outside the Courtroom, he was referring to this brief recess. He believed that his counsel was conferring with the government as the Court had suggested to get the paperwork in order.

Mr. Smith returned to Alabama to await his sentencing hearing. On his way back to Alabama, he called his probation officer to alert him that the trial was over and that he had been placed on home incarceration. At this time, his pretrial services officer advised him that an ankle monitor would have to be installed when he came to the office on Monday. He immediately reached out to his attorneys to advise that he didn't realize that this was how they monitored his location and to raise the concerns about his leg condition.

He reported to his Pretrial Services officer as directed on Monday morning. He immediately raised the concern that the ankle monitor could adversely affect his health. He made no misrepresentations to his Pretrial Services Officer – he simply relayed that he did not understand that this was required and advised that his attorneys were going to file a motion to get the condition modified. He asked his attorneys to do so as early as May 10 and continuing thereafter.

3

The government's assertion that Mr. Smith made false statements is not supported by the record. While it is true that the Court advised him that he was on home incarceration, the Court *did not* say that it would require an ankle monitor. And he was accurate that the Court left the bench while the paperwork was prepared and Mr. Smith left the courtroom for a short period of time with his wife and the other defense counsel while the remaining lawyers completed the paperwork. And, notably, the paperwork Mr. Smith signed did not make the requirement of an ankle monitor (as opposed to home incarceration) clear. The release order checked the box for release on home incarceration but did *not* check the box for location monitoring. *Id.* at p. 2. The language of the order indicated "You are restricted to 24-hour-a-day lock-down at your residence except for medical necessities and court appearances or other activities specifically approved by the Court." *Id.* While the Court referred to a "monitoring device" it was only one of Mr. Smith's attorneys who mentioned an ankle bracelet. Tr. ECF 88. Mr. Smith was understandably somewhat overwhelmed by all that had happened and did not focus on all the potential implications the monitoring device could have on his health. See Exh. 1. While he had been experiencing the effects of his cellulitis issue, he had not considered that an ankle monitor would be the only way to enforce the home incarceration. See Exh. 2 filed under seal – Medical Records).

On May 28, 2024, the government filed a motion to revoke his release conditions and, only after the government filed this motion, on May 30, 2024, the Probation Office filed a pretrial violation report. See ECF 89 and 90. The Court ordered a hearing to be held on May 31, 2024. Mr. Smith appeared at that hearing and the Court ordered him detained pending sentencing. Undersigned counsel was not at that hearing and has been unable to obtain the transcript as of the filing of this motion.

4

Mr. Smith avers that on multiple occasions he attempted to reach his then counsel to seek clarification or modification of his release conditions because of his medical condition making the wearing of an ankle bracelet at best uncomfortable, and at worst, dangerous. His counsel did not assist him in getting a modification. The paralegal exchanged text messages with him, but most of those text messages were about getting payment for the trial. Mr. Smith could not get a call with his attorneys to get a motion filed. It is Counsel's understanding that his attorneys acknowledged during the hearing on May 31 that they intended to file a motion but hadn't yet done so. Because he couldn't get a response from any of the three attorneys who had been paid dearly to represent him, he also could not request permission from the Court to attend his daughter's kindergarten graduation.

While he regrets doing so, because he was out for an approved medical appointment and when he reported to that appointment it was cancelled because the Doctor had a family emergency, he made the rash and foolish decision to deviate from his approved medical appointment to stop by his child's school so as not to disappoint her. He sincerely regrets this decision, but this one, minor violation is not an indication of a serious risk of flight that warrants detention pending sentencing, especially in light of his lengthy period of pretrial compliance. Importantly, Mr. Smith did not disrupt or cause any danger at the school. And, even though another child was graduating from second grade a few days later, because he did not have a medical appointment out of the house that day, he did not attend that ceremony. He did not actively flout the Court's orders – he was largely compliant.

Mr. Smith believes the person who reported his presence, described by the government as an employee of the school, was in fact, the wife of the agent who testified. The agent's wife is the communication director for the church associated with the school and is the only person who

5

would likely know that this particular agent was the person who was assigned to his case. The ceremony was at the church chapel. The agent's children also attend the same school.[2] Moreover, the agents purported statements that the staff of the school learned of Mr. Smith's home incarceration through media reports after his conviction appear to be untrue. While the news reported the *conviction,* counsel can find no indication that any of the news included the information that he was on house arrest or home incarceration. In fact, not even the government's press release so indicated. *See e.g*., Bryan Smith of Huntsville convicted for role in Jan. 6 Capitol Breach (waff.com) at https://www.waff.com/2024/05/13/huntsville-man-convicted-role-jan-6-capitol-breach/; District of Columbia | Alabama Man Convicted of Assaulting Law Enforcemen District of Columbia | Alabama Man Convicted of Assaulting Law Enforcement and Other Charges During Jan. 6 Capitol Breach | United States Department of Justicet and Other Charges During Jan. 6 Capitol Breach | United States Department of Justice at https://www.justice.gov/usao-dc/pr/alabama-man-convicted-assaulting-law-enforcement-and-other-charges-during-jan-6-capitol; Huntsville man convicted of assaulting officers during Jan. 6 U.S. Capitol riot - al.com at https://www.al.com/news/huntsville/2024/05/huntsville-man-convicted-of-assaulting-officers-during-jan-6-us-capitol-riot.html. Thus, the idea that a random teacher at the school would have contacted this particular FBI agent seems rather far-fetched.

With respect to the ankle monitor and Mr. Smith's condition, he had a legitimate concern that his pretrial services officer was made aware of and understood. (See Exh. 1 and 2). He provided a dated, signed letter from his health care provider and received permission to be out of his home for his medical appointments. (See Exh. 3). Moreover, counsel is aware of at least one

---

[2] Counsel has been provided pages of a yearbook from the school and a directory which appear to bear out these assertions. Counsel has not attached them here out of an interest in protecting the privacy of the Agent's family. This is also the reason Counsel has not referred to the Agent by name. If the government or Court wish to see the underlying documents, Counsel can file them under seal. Counsel also has the program from the kindergarten ceremony but has not filed it as it contains the names of the attendees at the school.

other individual who was in perfect health who suffered devastating injuries from an ankle monitor that fit tightly. *See United States v. Logan Barnhart*, 21-cr-35-6 (RC) (Statement of Reasons includes finding that Defendant credibly asserted he suffered physical harm from ankle bracelet while on home detention pretrial; defendant presented evidence that clotting resulted from ill-fitting ankle bracelet and nearly lost his leg). Mr. Smith's lawyers were made aware of the concern and should have promptly brought it to the attention of the Court. While this does not excuse Mr. Smith's deviation from his approved doctor's visit to also visit his daughter's school, the assertions about his medical condition are true and serious.

     Mr. Smith assures the Court that if given another chance he will abide by his release conditions as he did for two years pending trial. He would like the opportunity to work while pending sentencing to help support his family. (See Exh. 4, Letter of Offer of employment.)

                                   Respectfully submitted,

                                   A. J. KRAMER
                                   FEDERAL PUBLIC DEFENDER

                                   /s/

                                   Michelle Peterson
                                   Chief Assistant Federal Public Defender
                                   625 Indiana Avenue, N.W.
                                   Washington, D.C.  20004
                                   (202) 208-7500