UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:23-CR-00071-RDM |
| BRYAN SHAWN SMITH | |
| Defendant. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Bryan Smith to 78 months of incarceration, three years supervised release, $2,000 in restitution, and a $285 mandatory assessment. The requested 78-month prison sentence balances the factors articulated in 18 U.S.C. § 3553 and falls on the high end of the government's Sentencing Guidelines calculation for Bryan Smith, which is 63-78 months of imprisonment.

## I.    INTRODUCTION

The defendant, Bryan Smith, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

After attending the former president's rally on January 6, 2021, Smith walked to the United States Capitol carrying a stun gun in his pocket. He heckled and harassed police officers on the Lower West Front – including repeatedly disobeying officers' commands and obstructing officers from controlling a strategic doorway under scaffolding assembled for the impending inauguration. Smith then climbed the scaffolding to the Lower West Terrace. As one of the initial rioters to overtake this location, Smith immediately traveled to the Inauguration Tunnel ("Tunnel") where he participated in the initial assaults against officers there.

Smith initially pushed officers with other rioters as they attempted to breach the Capitol, and, after observing ongoing assaults against officers, removed and activated a stun gun in his pocket. Smith handed the stun gun forward to another rioter who used it against officers in the Tunnel. Numerous rioters used Smith's stun gun against police officers at the Capitol on January 6, 2021.[2]

After passing off the stun gun, Smith remained near the Tunnel where he led the mob chanting "*Whose House, Our House!*" Approximately 15 minutes later, Smith returned to the Tunnel where he and other rioters participated in a coordinated and violent "Heave, Ho" push against officers.

The government recommends that the Court sentence Smith to 78 months of incarceration. A 78-month sentence reflects the gravity of Smith's conduct and his complete lack of remorse for his actions.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

[2] *See United States v. Vitali Gossjankowski,* 21-cr-123 and *United States v. Zach Rash,* 24-cr-298.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021, Attack on the Capitol

The government refers the court to the Statement of Facts filed in this case, ECF 1, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election. The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.9 million dollars.

### B.     Bryan Smith's Role in the January 6, 2021, Attack on the Capitol

In the days preceding January 6, 2021, Smith traveled from his home in Alabama to Washington D.C. to attend the former president's rally. In communications before his travel, Smith discussed attending the events in Washington D.C. on January 6, 2021, to protest the results of the 2020 presidential election. On November 16, 2020, Smith posted on his Facebook page, "The light will defeat the darkness my brother… They will have to answer to 'we the people' very very soon!!!" On December 12, 2020, Smith posted, "[W]hen I get back from DC in a few weeks sir… We will have plenty to celebrate and talk about!" On January 3, 2021, Smith posted, "This is going to be a historic day that will define the trajectory of this republic for generations… Fo Sho!"

Smith attended the former president's speech at the Ellipse on January 6, 2021. Following the speech, Smith traveled to the Capitol while wearing military style clothing. Smith also communicated with a tactical radio and earpiece, carried a "selfie-stick", and possessed a stun gun in his pocket. Sometime a little before 2:10 p.m., Smith arrived on the West Front of the Capitol.

Once Smith arrived on Capitol grounds, he proceeded to a police line on the West Front. At this police line, Smith harassed and heckled police officers. These efforts included questioning

officers' motives for holding the line and preventing rioters from moving deeper onto Capitol grounds.



*Image 1: Screenshot from Body Worn Camera ("BWC") footage, Exhibit 701A, showing Smith, circled in yellow, harassing officers along the police line surrounding the bottom of the inauguration stage after initially arriving at the Capitol.*

After Smith initially approached the police line on the Lower West Front, he slowly moved with rioters to scaffolding assembled for the inauguration on the southwest corner of the West Front ("Southwest Scaffolding"). Smith repeatedly harassed and yelled at police officers along the police line who were guarding the United States Capitol and interfered with their ability to manage the developing riot at the Capitol on January 6, 2021.



*Image 2: Screenshot from BWC footage, Exhibit 706A, showing Smith (circled) interacting with an officer near the Southwest Scaffolding.*

At approximately 2:30 p.m. rioters breached security barricades and the police line on the West Front. In response to this breach, a group of officers moved behind a door underneath the Southwest Scaffolding. Moments later, Smith opened this door. Officers commanded Smith to step away from this door and allow the officers to close it; Smith refused and held the door open, impeding officers' ability to secure this location. Smith responded to the officer's order to close the door with, "There's a fucking million and a half people back there you don't think I could get through that door."



*Image 3: Screenshot from BWC footage, Exhibit 707 at 1:43, showing Smith arguing with officer's over the Southwest Scaffolding doorway.*

Immediately thereafter officers retreated to the Lower West Terrace to stop rioters from advancing on the Capitol. After harassing officers on the West Front, Smith followed officers and climbed the Southwest Scaffolding to reach the Lower West Terrace.



*Image 4: Exhibit 607B, showing Smith (circled) climbing scaffolding to the Lower West Terrace.*

Smith slowly moved across the Lower West Terrace towards the Inauguration Tunnel Entrance ("Tunnel"). The Tunnel is a narrow point of entry on the Lower West Terrace of the Capitol where some of the most violent interactions between rioters and law enforcement occurred on January 6, 2021.



*Image 5: Exhibit 610, showing Smith (circled), on the Lower West Terrace near the Tunnel.*

At approximately 2:49 p.m., Smith entered the Tunnel, observed the chaotic scene around him, and participated in a violent assault against multiple law enforcement officers. Smith immediately moved to the front of the mob where he joined in pushing other rioters into police officers in a coordinated push against officers to overwhelm, and break through, the police line. Smith then retreated to the rear of the Tunnel and, at approximately 2:53 p.m., removed a stun gun from his pocket. With the stun gun in his hand, Smith moved toward the police line and activated the device by sparking the stun gun in front of his face to check that it worked.



*Image 6: Screenshot of CCTV footage, Exhibit 402G, showing Smith (circled) spark the stun gun inside the Tunnel.*

Smith attempted to pass the stun gun forward by waiving the stun gun to rioters at the front of the mob who were closer to officers. After one rioter refused to take the stun gun from Smith, a second rioter, Zach Rash, grabbed the stun gun from the Smith's hand.[3] Seconds later, Rash checked the device and lunged at officers with the stun gun on two separate instances approximately 20 seconds apart.

---

[3] *See United States v. Zach Rash,* 24-cr-298.



*Image 7: Screenshot from CCTV footage, Exhibit 402I, showing Smith (circled in yellow) passing off the stun gun to Rash in the Tunnel (circled in green).*

At approximately 2:53 p.m., after passing the stun gun to the second rioter, Smith exited the Tunnel. As he exited the Tunnel, Smith pumped his fist in an apparent effort to inspire others in the growing crowd to press into the Tunnel and continue the riot.



*Image 8: Exhibit 615C, showing Smith (circled), pumping his fist and chanting outside the Tunnel after handing off the stun gun.*

Thereafter, Smith led the mob in chants ("whose house, our house") and remained on the Lower West Terrace for some time with the mob. At approximately 3:16 p.m., Smith returned to the Tunnel. He made his way to the front of the mob in the Tunnel and joined a group of rioters who were involved in another coordinated push against police officers.



*Image 12: Exhibit 613D, showing Smith (circled) joining a "Heave, Ho" push in the Tunnel.*

After Smith left the Tunnel, he remained on the Lower West Terrace with the mob. At one point Smith was directly adjacent to an officer whom other rioters removed from the Tunnel and were assaulting.

*Smith's Post-Conviction Actions*

Following his convictions at trial on May 10, 2024, the Court placed Smith on home incarceration pending sentencing. Smith violated these release conditions almost immediately, and the government subsequently moved to revoke Smith's release. ECF 89. The Court held the bond revocation hearing on May 31, 2024. At the hearing, Smith offered contradictory and illogical excuses for violating the conditions of his release. Based on the evidence the government and Smith presented, the Court concluded under 18 U.S.C. 3148 that Smith would not abide by any condition or combination of conditions. In reaching this conclusion, the Court questioned Smith's renditions of events and proffered excuses while opining on Smith's apparent lack of candor to the Court during his testimony under oath.[4] Based on this, the Court revoked Smith's bond status. *See* Minute Order, May 31, 2024. Smith filed a motion to reconsider this revocation on August 1, 2024. ECF 101. The Court denied this motion on August 23, 2024, and again, addressed Smith lack of candor. *See* Minute Order, August 23, 2024 ("Although Mr. Smith now acknowledges that his prior account was not fully truthful, this acknowledgement does not vitiate his previous lack of candor with the Court. [] But given Mr. Smith's lack of candor in prior proceedings and his prior violation, that is not a step the Court can take.").

After this Court revoked Smith's release and ordered his incarceration in the Washington D.C. Central Detention Facility, Smith decided to spend his time speaking to the self-described

---

[4] The government has not received the transcript of this hearing and is unable to provide the Court specific quotations about the Court's concern over Smith's honesty during the revocation hearing.

nightly "January 6 Vigil" during the summer of 2024. Smith's continued disdain for the rule of law was on full public display at this event outside the detention facility. If the Court needed any additional proof of Smith's complete lack of remorse, the Court should look no further than a sampling of Smith's public statements at the "Vigil", as follows:[5]

On June 19, 2024, Smith referred to himself as a "political prisoner" and stated that it was, "his honor to have served in that gap for the people that weren't there," a reference to his pride for the actions he committed on January 6, 2021.

On June 22, 2024, Smith stated that, "Judges have been giving lower sentences for 111(b) charges, since they know they'll be held accountable someday for their actions." Smith discussed knowing that the truth about the "persecution will come out." Smith said that, "everyone [referring to other January 6, 2021, detainees] see this is a far bigger battle and we're all on this hill to die on."

On June 26, 2024, Smith said before his sentencing date that he received 9 years of incarceration.

On August 2, 2024, Smith addressed the circumstances of his motion to reconsider his bond revocation. He stated, "Really, it's less about the bond and more about correctly falsity [sic], the false witness that was bore against me and the nonsense that the U.S. Attorney's Office and the FBI threw at me… the truth matters more to me that the result." Smith also stated, "To be honest, I'd rather be on the side of having someone bear false witness against me then be in their position, [], because there is a judge in the 6th Circuit and an ultimate Judge in Heaven. That's the real courtroom."

Smith's statements have not been confined to the "January 6 Vigil." Smith has participated in several podcasts published on Amazon Music. On October 6, 2024, he referenced his upcoming sentencing and stated:

"I'm going to speak truth to the lies and I'm going to clear my name. Unfortunately, it's not going to come off as very repentant [] and I'm going to call the balls and

---

[5] *See* June 22, 2024, https://www.youtube.com/watch?v=-ltdL4b3D38 (starts approx. 1:03:00).
June 26, 2024, https://www.youtube.com/watch?v=LeJjOlPhsCc (starts approx. 1:10).
July 3, 2024, https://www.youtube.com/watch?v=XGNNnGyGnmc (starts approx. 1:03).
July 6, 2024, https://www.youtube.com/watch?v=lO7TOyGbvRg (starts approx. 0:59:00).
July 12, 2024, https://www.youtube.com/watch?v=l5_lDGSVqD0 (starts approx. 1.29).
August 2, 2024, https://www.youtube.com/watch?v=-LiWM81UDeg (starts approx. 1:23:20)
August 6, 2024, https://www.youtube.com/watch?v=1REl2hJaIHc (started approx. 1:19:00).

strikes, I'm going to call the truth and the lies and set the record straight, and I'm going to rebuke the spirits that have been moving against me in this process. [] Pretty sure they're not going to be happy about that."[6]

## III.    THE CHARGES AND DISPOSITION

On March 6, 2024, a federal grand jury returned a superseding indictment charging Smith with seven counts, including, 18 U.S.C. § 231(a)(3), 18 U.S.C. § 111(a)(1), 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 18 U.S.C. § 1752(a)(4), 40 U.S.C § 5104(e)(2)(D) and 40 U.S.C § 5104(e)(2)(F). On May 10, 2024, following a bench trial, this Court convicted Smith of all counts, except for entering an acquittal on the 40 U.S.C § 5104(e)(2)(D) count.[7]

On May 10, 2024, the Court placed Smith on home incarceration pending sentencing. Smith quickly violated his release conditions. The Court held a bond revocation hearing on May 31, 2024, and revoked Smith's bond status. Smith has remained incarcerated since May 31, 2024.

## IV.    STATUTORY PENALTIES

Smith now faces sentencing on 18 U.S.C. § 231(a)(3), 18 U.S.C. § 111(a)(1), 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 18 U.S.C. § 1752(a)(4), and 40 U.S.C § 5104(e)(2)(F).

As noted by the Presentence Report issued by the U.S. Probation Office, Smith faces up to 5 years imprisonment, a term of supervised release of not more than 3 years, and a fine up to $250,000, on Count 1; 8 years imprisonment, a term of supervised release of not more than 3 years, and a fine up to $250,000, on Count 2; 1 year imprisonment, a term of supervised release of not more than 1 year, and a fine up to $100,000, on Count 3; 1 year imprisonment, a term of supervised release of not more than 1 year, and a fine up to $100,000, on Count 4; 1 year imprisonment, a

---

[6] *See* https://music.amazon.com/es-ar/podcasts/57f407b7-eb12-4bcc-a3de-f64365f9e4c1/episodes/68386870-0b6a-424e-b99c-c1a6ebc5895e/j6-sunday-devotional-from-the-dc-jail-j6-sunday-devotional-from-the-dc-jail--10-6-2024 (Starts approx. 9:00)

[7] The related case, *United States v. Zach Rash,* 24-cr-298, is scheduled for sentencing before this Court on November 20, 2024.

term of supervised release of not more than 1 year, and a fine up to $100,000 Count 5; 6 months imprisonment, a term of supervised release of not more than 1 year, and a fine up to $5,000 on Count 7. Smith is also subject to restitution and a mandatory special assessment of $285.[8]

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The initial PSR errs in failing to include the U.S.S.G. § 2A2.2(b)(1) enhancement for more than minimal planning for Counts 1-5. Under application note 2, more than minimal planning "means more planning than is typical for the commission of the offense in a simple form." The evidence shows that Smith planned for the events of January 6, 2021, arriving at the Capitol prepared for violence. In the weeks before January 6, 2021, he made numerous postings that the government would have to "answer to 'we the people' very soon." He foresaw January 6, 2021, as a "historic" day that "would change the trajectory" of the country. And he anticipated "celebrating" the days' events when he returned. Considering this, he planned his travel from Alabama to Washington D.C. anticipating violence. He traveled to the Capitol wearing military style garb with

---

[8] Consisting of the mandatory assessments of $100 for each felony conviction (Count One and Two), $25 for each class A misdemeanor conviction (Count Three, Four, and Five) and $10 for the class B misdemeanor conviction (Count 7).

radios and a companion earpiece, equipment often associated with tactical movements. And he brought a stun gun to the Capitol. The Court's finding that Smith armed the device, showing that he was familiar with it, supports a conclusion that he brought it and planned to use it. ("He placed the pin in it, which we have later learned was essentially the safety device, indicating that he was familiar with the device. It wasn't something he just found on the ground. He knew how it operated and rendered it to be operational.") Tr. Tran., 5-10-24 at 71. Smith's conduct was premeditated; he prepared for the violence that day and the Court should apply this enhancement.

The initial PSR also errs by not including the 4-point dangerous weapon enhancement under U.S.S.G. § 2A2.2(b)(2)(B). Instead, the initial PSR includes the 3-point dangerous weapon enhancement under U.S.S.G. § 2A2.2(b)(2)(C). The Court should apply the 4-point enhancement under U.S.S.G. § 2A2.2(b)(2)(B) because the Court convicted Smith of 18 U.S.C. 111(a)(1) for aiding and abetting Rash's use of the stun gun on officers. After Smith handed the stun gun to Rash, Rash checked the stun gun's functionality and assaulted officers with the stun gun on two separate occurrences. Video footage showed Rash lunge and fire the stun gun at officers. Rash's conduct was part of Smith's relevant conduct under U.S.S.G. § 1B1.3(a)(1)(A). Therefore, since Rash affirmatively used a dangerous weapon during the assault, as opposed to brandishing the dangerous weapon, the 4-level specific offense increase under U.S.S.G. § 2A2.2(b)(2)(B) should apply.[9]

The government agrees with the remainder of the initial PSR's guidelines calculation. That Guidelines analysis, including the U.S.S.G. § 2A2.2(b)(1) enhancement, is as follows:

---

[9] The Government previously recommended that probation include the 3-level increase under U.S.S.G. § 2A2.2(b)(2)(C) following Smith's convictions. However, upon further review of the facts, the government believes that U.S.S.G. § 2A2.2(b)(2)(B) is the correct guidelines enhancement under the guidelines.

<u>Count One: 18 U.S.C. § 231(a)(3)</u>

| U.S.S.G. § 2A2.2 | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(1) | More than Minimal Planning | +2 |
| U.S.S.G. § 2A2.2(b)(2)(C) | Dangerous Weapon Enhancement | +3 |
| U.S.S.G. § 3A1.2(a) and (b) | Victim-related adjustment | <u>+6</u> |
| | **Total** | **25** |

<u>Count Two: 18 U.S.C. § 111(a)(1)</u>

| U.S.S.G. § 2A2.2 | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(1) | More than Minimal Planning | +2 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon Enhancement | +4 |
| U.S.S.G. § 3A1.2(a) and (b) | Victim-related adjustment | <u>+6</u> |
| | **Total** | **26** |

<u>Count Three: 18 U.S.C. § 1752(a)(1)</u>

| U.S.S.G. § 2X1.1(a) | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(1) | More than Minimal Planning | +2 |
| U.S.S.G. § 2A2.2(b)(2)(C) | Dangerous Weapon Enhancement | +4 |
| U.S.S.G. § 3A1.2(c) | Victim-related adjustment | <u>+6</u> |
| | **Total** | **26** |

<u>Count Four: 18 U.S.C. § 1752(a)(2)</u>

| U.S.S.G. § 2A2.2 | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(1) | More than Minimal Planning | +2 |
| U.S.S.G. § 2A2.2(b)(2)(C) | Dangerous Weapon Enhancement | +4 |
| U.S.S.G. § 3A1.2(c) | Victim-related adjustment | <u>+6</u> |
| | **Total** | **26** |

<u>Count Five: 18 U.S.C. § 1752(a)(4)</u>

| U.S.S.G. § 2A2.2 | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(1) | More than Minimal Planning | +2 |
| U.S.S.G. § 2A2.2(b)(2)(C) | Dangerous Weapon Enhancement | +4 |
| U.S.S.G. § 3A1.2(a) and (b) | Victim-related adjustment | <u>+6</u> |
| | **Total** | **26** |

<u>Count Seven:</u>

The Sentencing Guidelines do not apply to Class B misdemeanors. *See* 40 U.S.C. § 5109(b); 18 U.S.C. § 3559(a)(7); U.S.S.G. § 1B1.9

Grouping Analysis

Under U.S.S.G. § 3D1.2(a), there are two separate Groups on the counts of conviction, both which involve the same victims and/or the same transactions. Group One consisting of Count One, Count Two, and Count Five. Group Two consist of Counts Three and Four. Therefore, the calculations yields two units. PSR ¶ 47, 48. Groups One and Two are grouped together pursuant to U.S.S.G. §3D1.2(c) because one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts. PSR ¶ 49.

**Total Adjusted Offense Level:**                                      **26**

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

Section 4C1.1 does not apply in this case. The Court convicted Smith of violent offenses under 18 U.S.C. § 111(a)(1) and 18 U.S.C. § 231(a)(3) for his actions in the Tunnel, specifically those involving a stun gun and other efforts to physically obstruct officers. Many of his actions were violent, including repeated, coordinated, efforts to push against the officers in the Tunnel with other rioters. However, most aggravating, was Smith's decision to introduce a stun gun into the riot for use against the officers. This act not only facilitated and threatened additional violence, but, as he eagerly passed the stun gun forward, he directly encouraged others to use the stun gun against officers in the Tunnel.

The U.S. Probation Office calculated Smith's criminal history as category I, which is not disputed. PSR ¶ 61. Accordingly, based on the government's calculation of Smith's total adjusted offense level at 26, Smith's Guidelines imprisonment range is 63 to 78 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Smith's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Smith traveled to the Capitol ready for a fight. He made posts on social media alluding to potential violence, stating that January 6, 2021, would be a "historic day" and "[t]hey will have to answer to 'we the people' very very soon!!!" After climbing scaffolding, he spent nearly thirty minutes near the Tunnel where some of the most violent interactions between rioters and officers took place. He participated in that violence by joining coordinated pushes against officers in the Tunnel numerous times. Not satisfied with his first efforts inside the tunnel during which time he passed the stun gun to a co-rioter who then used it against the overwhelmed and exhausted police, he reentered a second time to help push against the officers. And in the interim between his Tunnel assaults, he helped rile up the mob, leading them in chants.

The Court addressed the seriousness of Smith's decision to introduce a stun gun into the riot that was used against officers in the Tunnel:

> "And everyone here agrees that when the VTS797 is fired, it emits a very loud and scary electrical shock-type noise that one typically associates with a Taser-like device. And an officer hearing that device, in my view, would be concerned about their physical safety, particularly when it is pointed in their direction in the middle of a riot as occurred here. Sergeant Bogner testified that despite all of the noise and commotion that was occurring in the tunnel that day, he and other officers in the tunnel were able to discern the noise from a stun gun being discharged like the VTS797, []. And when you know that sound, you know it to be a weapon. And it is something you pay attention to. Sergeant Bogner elaborated by stating that a stun gun presents safety concerns, because a stun gun can hurt you. It can cause pain. It can cause burns. It is something you pay attention to because you don't want it used on you."

Tr. Tran, 5-10-24 at 76 (internal quotations omitted).

This Court continued to address the particularly aggravating characteristics surrounding the stun gun: "I will say, because this doesn't come across in the record, but when you hear the device fire, it is frightening. And I understand that there was a lot of noise in the tunnel, but it is extremely loud and an extremely disturbing noise. And I know that I personally jumped when I heard the device." Tr. Tran, 5-10-24, at 76.

But Smith's introduction of the stun gun into the riot, was only part of his criminal activity. He prepared for violence on January 6. He taunted and obstructed officers on the West Front, at one point preventing officers from closing a critical door. At trial, multiple officers testified to the intimidating nature of Smith's actions. *See e.g.* Direct Examination of Glenn Lombardini, Tr. Tran. 5-7-24 at 28. He was one of the initial rioters to enter the Tunnel. He encouraged the mob outside the Tunnel. He assaulted officers in the Tunnel at different times. He remained on the Lower West Terrace after he left, at one point directly adjacent to an officer whom other rioters removed from the Tunnel and were assaulting. And Smith continues to relish in his actions from the D.C. Central Detention facility, evinced by his participation in the self-described "January 6-Vigil." All of this, in conjunction with Smith's absolute lack of remorse for his acts, is of the utmost seriousness and supports the government's recommended sentence of 78 months incarceration.

**B. The History and Characteristics of Smith**

Smith is 37 years old and was previously an aircraft inspector and maintenance technician. PSR ¶ 90. Smith was born in Bremerhaven, Germany and was raised in Fonda, New York by his mother and stepfather. PSR ¶ 71. Smith served in the United States Army for approximately 6 years and has resided in Madison, Alabama since 2017. PSR ¶ 75, 93. Smith has education in federal aviation and aeronautics with extensive professional experience in aerospace engineering. PSR ¶ 89, 92-104. Smith was raised in a stable family and maintains close relationships with his

parents and siblings. Despite this, and despite his military background – which should have made him acutely aware of the difficulties the police were facing against the riotous mob and the danger of introducing a stun gun into the melee – he violently attacked them. And although he had been diagnosed with Post-Traumatic Stress Disorder, for which crowded spaces is a trigger, he willfully planned for and participated in a riotous mob, entering the crowded tunnel twice.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Smith's criminal conduct on January 6 was the epitome of disrespect for the law.

### D. The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[10] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Smith's conduct on January 6, 2021, was particularly troublesome, and his disdain for the rule of law thereafter and absolute lack of remorse following his convictions is equally aggravating. Following his conviction, Smith disregarded Court orders and continues to blame

---

[10] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

others for his actions. While the concept of specific deterrence is relevant during all sentencing proceedings, its application is uniquely important to individuals like Smith. His criminal activity and notable lack of remorse, including embracing a range of conspiracy theories to shirk responsibility for his criminal actions, demands a lengthy term of incarceration.

Smith's preparation and actions on January 6, 2021, are well-documented in this memorandum. Smith planned for January 6, 2021. He wore military style clothing, brought a stun gun, and introduced that stun gun into the mob to be used against officers. He provoked the mob as he led chants directly outside the Tunnel. He returned to the mob and continued participating in assaults against police in the Tunnel. His criminal activities on January 6, 2021, standing alone, warrant a considerable sentence to deter him going forward.

But its Smith's actions and comments during the pendency of these proceedings that offer insight into his true character and the unique need to deter him. Smith consistently failed to recognize the severity of these proceedings.

Following his convictions at trial, Smith immediately violated his conditions of release. The Court held the bond revocation hearing on May 31, 2024. Based on the evidence the government and Smith presented, the Court questioned Smith's apparent lack of candor to the Court. The Court denied Smith's subsequent motion to reconsider based, in part, on this lack of candor as discussed *supra*. *See* Minute Order, August 23, 2024.

After this Court revoked Smith's release and ordered his incarceration in the Washington D.C. Central Detention Facility, Smith continued to deny his conduct on January 6, 2021. He characterized the actions of rioters as honorable or praiseworthy and referred to the perceived injustices for being prosecuted for his crimes.

At his revocation hearing Smith tried to distract from the statements he offered at the

"Vigil," and blamed the government for taking his comments out-of-context. He continued to make such representations on subsequent podcasts uploaded to Amazon Music. These representations lack merit. Smith's comments were recorded for public consumption. Despite Smith's continued attempts to whitewash his actions on January 6, 2021, his subsequent actions and statements,[11] show a disdain for these proceedings; willingness to question this Court's authority; and embrace and platform baseless conspiracy theories to justify his actions. The Court must deter Smith from these actions and, to do so, should fashion a lengthy term of incarceration.

     **E.**       **The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

---

[11] Smith also misled probation regarding his social media accounts. PSR ¶ 91. Despite not reporting social media accounts, Smith maintained several accounts during the course of these proceedings. The government offered exhibits from Smith's Facebook account at trial, and included some of those exhibits in this memorandum.

F.    **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances."

*United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[12]  "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[13] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

While Smith's case represents a singular constellation of facts and aggravating factors, Courts have routinely sentenced defendants to lengthy terms of incarceration for (1) bringing weapons, including stun guns, to the January 6, Capitol riot; (2) assaulting police officers in the Tunnel; and (3) demonstrating a lack of remorse. Smith falls within all three of these categories.

In *United States v. Kyle Young,* 21-cr-291, Judge Amy Berman-Jackson sentenced Young to the government's recommendation of 86-months' incarceration and 36 months' supervised release, for his actions on January 6, 2021, specifically with a stun gun. While Young faced a total offense level of 24 and a guidelines range of 77-96 months given his criminal history category of IV, his conduct of bringing a stun gun to the Capitol and handing it to another rioter in the Tunnel

---

[12] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[13] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

offers the Court a nearly identical factual comparator. Judge Berman-Jackson addressed this conduct, standing alone. ("If the facts of the case stopped right there with giving of the taser to Danny Rodriguez, we would be talking about a substantial sentence. [] I want [you] to think about that for a moment. You arm someone who, as far as you know, had no experience and no training in how to use the weapon at all much less how to do it safely. He had no training in, for example, where on a person's body it's supposed to be directed or about the end to avoid the head and the neck to avoid potentially life-threatening consequences.") Sent. Tr. at 49.

But the Court also noted how Young, like Smith, was not finished after he passed off a weapon in the Tunnel. While Young grabbed a strobe light and flashed it in front of officers so they could not see the continued assaults against them, thereby protecting themselves, Smith also was not finished after he passed off the stun gun. He stayed near the Tunnel and retuned and continued to assault officers as he engaged in a "Heave-Ho" push against officers with other rioters when he returned to the Tunnel. A notable distinction between Young and Smith is Young's decision to accept responsibility and plead guilty to one count of 18 U.S.C. § 111(a)(1). Smith faces an entirely different sentencing posture given his convictions on additional felonious and misdemeanor conduct arising from his actions on January 6, 2021, following a bench trial.

While each case has different aggravating and mitigating circumstances compared to Smith, Courts have routinely imposed significant sentences on rioters for assaulting officers in the Tunnel. For example. In *United States v. Vincent Gillespie*, 22-cr-60 (TNM), the guidelines range was 63 to 78 and the defendant had no prior criminal history. The Court sentenced the defendant to 68 months following a jury trial. Gillespie similar to Smith started on the West Front and made his way through the crowd to the tunnel. At the mouth of the tunnel, he used a riot shield to push against officers in an effort to force his way inside. Gillespie also grabbed an officer's arm, which

interfered with the officer's ability to stop other rioters. Like Smith, Gillespie was enthusiastic during his attack and showed no remorse afterwards. In an interview afterwards Gillespie said, "We were very close. We were almost overpowering them." Both defendants engaged in separate, but distinct aggravating conduct. Unlike Smith, Gillespie did not bring a weapon to the Capitol with him, he used an item he obtained on the grounds. Gillespie's lack of more than minimal planning accounts for the slightly lower sentence there.

In *United States v. Patrick McCaughey, 21-cr-40 (TNM),* Judge McFadden sentenced McCaughey, who faced a total offense level of 34, to 90 months' incarceration following a jury trial.[14] Aside from the aggravating presence of a stun gun in Smith's case, the facts presented in *McCaughey* and *Smith* are markedly similar. Both Smith and McCaughey illegally entered the Capitol grounds at approximately 2:00 p.m. Both spent time along a bike rack barricade taunting officers and joining the mob that ultimately overwhelmed this line when it collapsed at 2:28 p.m. McCaughey, like Smith, climbed to the Lower West Terrace, using the southwest scaffolding to do so. McCaughey, also like Smith, proceeded directly to the Tunnel and entered the Tunnel at 2:51 p.m., nearly two minutes after Smith entered the Tunnel. Smith and McCaughey both participated in "heave-ho" pushes against officers. Paralleling Smith's actions, McCaughey left the Tunnel and returned a few minutes later to rejoin the rioters still attempting to break into the building. Both he and Smith headed to the front of the mob when they entered a second time. Both defendants engaged in separate, but distinct aggravating conduct. Smith introduced a stun gun that other rioters used against officers. McCaughey used a police shield to pin and attack officers at the front of the mob. Smith's conduct, like McCaughey, calls for a substantial term of incarceration.[15]

---

[14] Smith and McCaughey faced similar convictions under 18 U.S.C. § 111(a)(1), 18 U.S.C. 231(a)(3) and 1752. However, McCaughey was also convicted of 18 U.S.C. 1512(c)(2).
[15] The downward departure in McCaughey's case can be attributed to several mitigating factors

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

---

that are not present in Smith's case, including: A "moment of humanity" (McCaughey tried to help Officer Hodges after he screamed in pain by lowering his face shield and pointing out to other officers that he was hurt); McCaughey did not come to the Capitol with any weapons or defensive gear; and McCaughey did not broadcast on social media. Judge McFadden also noted McCaughey's age (23 at the time of the crime) and his apparent remorse.

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[16] As the PSR states, mandatory restitution under the MVRA applies to this case. PSR at ¶ 32.

Because Smith in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more

---

[16] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.*

More specifically, the Court should require Smith to pay $2,000 in restitution for his convictions on Count One, Two, Three, Four, Five and Seven. This amount fairly reflects Smith's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.  FINE

Smith's convictions for violations of 18 U.S.C. § 231(a)(3), 18 U.S.C. § 111(a)(1), 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 18 U.S.C. § 1752(a)(4), and 40 U.S.C § 5104(e)(2)(F) subject him to a statutory maximum fine of $250,000 for Count 1, $250,000 for Count 2, $100,000 for Count 3, $100,000 for Count 4, $100,000 for Count 5, and $5,000 for Count 6. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider Smith's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where a defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, Smith's financial assets set forth in the PSR suggest a net worth of approximately $50,000. PSR ¶ 105. However, he is subject to delinquent judgments against him.

PSR ¶ 111, 1114. Therefore, Smith is unable, and is unlikely to become able, to pay a fine. PSR ¶ 114.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 78 months' incarceration, three years' supervised release, $2000 in restitution and a $285 mandatory assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:    /s/ Eli J. Ross
Eli Ross
Assistant United States Attorney
Bar No. IL 6321411
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 297-1515
Email: Eli.Ross@usdoj.gov

/s/ Sara E. Levine
Sara E. Levine
Assistant United States Attorney
VA Bar No. 98972
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 252-1793
Email: Sara.Levine@usdoj.gov