## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Crim. No. 23-71 (RDM) |
| BRYAN SMITH, | |
| Defendant. | |

## MEMORANDUM IN AID OF SENTENCING

I.    **Introduction**

Bryan Smith traveled to the "Stop the Steal" rally because he believed there were irregularities in the election that had occurred. He had been consumed by allegations that the election was not free and fair, and he expressed those views before and after January 6, 2021. However, while he had very strong views in the aftermath of the 2020 election, he is not affiliated with any extremist group. His postings on Facebook were hyperbolic, like many social media users, but were not indicative of any intent to commit violence. He came to D.C. to watch the rally and he then joined everyone else that walked toward the Capitol. To his credit, he never entered the Capitol building. Counsel will not comment extensively on the facts as were found by the Court at the trial for two reasons. First, the Court and everyone else involved in the sentencing hearing was there, while Counsel was not. Even more importantly, Mr. Smith, having been convicted at trial, has a right to appeal that conviction and thus is someone constrained in what he can and should say at this point.

Mr. Smith has experienced severe consequences for his actions, including losing his job and his licenses to perform the work that he has done for decades. Moving forward, and for the rest of Mr. Smith's life, his felony conviction in this case will disrupt his ability to obtain employment and has caused him to lose other privileges and liberties afforded to all citizens. He has been separated from his family, including his wife and two young children. His relationship with his two older children has deteriorated greatly since his arrest. Indeed, no matter what sentence this Court imposes, Mr. Smith will continue to experience the ripple effects of his destructive lack of judgment for the rest of his life. Perhaps most importantly, even if he is pardoned by President-Elect Trump, he will likely not be able to return to his vocation - he has lost his licenses with the Federal Aviation Administration; he's lost his security clearance with the government; and he's lost the company that he started with his wife.

While Mr. Smith went to trial, he did so not because he believed he did *nothing* wrong, but because he didn't believe that the charges the government was bringing were correct and believed that the government was punishing him not just for what he did but for his beliefs and for fighting the charges. He may have been willing to accept a plea offer to what he believed he did but was not willing to admit to conduct or intentions that he believes he did not have. The sentence requested by the government of 78 months is more than that which is necessary to meet the statutory purposes of sentencing, especially in light of sentences imposed on other individuals charged who engaged in similar and often more egregious conduct.

## II.    Procedural History

Mr. Smith was charged by criminal complaint on November 30, 2022, with several charges: 1) Civil Disorder in violation of 18 USC § 231(a)(3); 2) Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); 3) Disorderly or Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A); 4) Engaging in Physical Violence in a Restricted Building or Grounds) in violation of 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A); 5) Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D); and 6) Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G). At that time, he was represented by retained counsel from Alabama.

On March 8, 2023, he was indicted for Civil Disorder in violation of 18 USC § 231(a)(3); Assault in violation of 18 USC 111(a); Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); Engaging in Physical Violence in a Restricted Building or Grounds) in violation of 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A); and 5) Acts of Physical Violence in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(F). Trial was scheduled but continued when a breakdown occurred between Mr. Smith and his retained counsel. At that point, Mr. Smith elected to proceed *pro se* and a new trial date was set. Mr. Smith isolated himself and spent his time focusing on his family and employment, to the exclusion of preparing for

3

trial. He likely suffered from anxiety and depression, although he did not seek mental health treatment. Then, in March 2024, a superseding indictment was filed adding a 111(b) charge and modifying some of the misdemeanor charges. Mr. Smith saw this as an overreach and reacted poorly. The government ultimately appears to have recognized that overreach in that it elected not to proceed on the 111b before trial. Shortly before trial, Mr. Smith retained new counsel and proceeded to a bench trial.

### **The Court's Verdict**

The Court found Mr. Smith guilty on all but one charge, Count 6. However, with respect to Count 2, before trial the government announced that it would not proceed on the more serious enhanced 111(b) charge, and the Court found him guilty of the unenhanced lesser included offense. The Government also advised that they were not seeking a conviction on the 111(a) on the theory of physical contact with the officers that were assaulted. Tr. 5/10/24, p. 63.

The Court noted that the trial was focused on three interactions: 1) the interaction on the police line on the west front of the Capitol; 2) the interaction at the Southwest scaffolding; and 3) the interaction at the tunnel. Tr. 5/10/24, pg. 45. The Court heard testimony at the trial of considerable violence, especially in the tunnel area. *Id*. at 49. The Court found Mr. Smith guilty of the Civil Disorder charge based upon his actions at the scaffolding where police officers were "desperate to keep, maintain that line and to keep people from encircling them." *Id*. 50. The doors that lead to the stairs to the lower west terrace were closed when

another rioter, *not* Mr. Smith, opened the middle door. *Id.* at 51. The Court found
that while Mr. Smith did not open the door, he approached, leaned on the
scaffolding, and when told to get back, he did not. The Court found that Mr. Smith
argued with the officers and leaned against the door despite instructions to retreat.
*Id.* 51. After arguing with the officers, he did step back and let the door close. *Id.* at
52. As the Court noted, Mr. Smith was not yelling, but was speaking with intensity
and anger during this confrontation. *Id.* In taking these actions, the Court found
Mr. Smith was guilty of civil disorder. The Court also found that the government
could have convicted Mr. Smith of the civil disorder charge based upon his
participation in the heave-ho pushing with the officers at the tunnel. *Id.* at 58-59.

With respect to Count 2, the Court found that Mr. Smith was guilty of
violating 111(a) not by assault, but by aiding and abetting the assault by another
person with what the Court characterized as a sparking device or a stun gun. *Id.* at
64-65. The Court did not find that Mr. Smith made direct physical contact with any
officer. *Id.* at 67-68.

The Court rejected the defense that he did not bring the sparkler or stun gun
that was used to the Capitol that day. *Id.* at 71. However, there was no evidence
adduced that Mr. Smith had previously owned or purchased the item. There were
no text messages talking about bringing weapons, there were no purchase receipts
or other indications that Mr. Smith had the sparkler or stun gun before arriving
that day, as there has been in other cases. It has been typical in these cases for the

government to subpoena and provide records of such purchases – they were none here.[1]

The Court found that Mr. Smith held the sparkler or stun gun up for another rioter to take and that Mr. Rash ultimately grabbed it and used it against an officer. The Court held that it did not need to find whether or not the stun gun or sparkler was capable of causing harm because it was sufficient to cause someone to fear injury. *Id.* at 75. "When Mr. Rash fired the stun gun while lunging at the police officers in the tunnel, he threatened them with bodily injury and had the apparent ability to inflict that injury, even if the actual stun gun he was holding was not something that would, in fact, cause injury." *Id.* at 75-76.

At the conclusion of the trial, the Court placed Mr. Smith on strict conditions of confinement. When the Court determined that he was not in compliance with those conditions, Mr. Smith was remanded. He has been in custody since May 31, 2024. Mr. Smith now comes before this Court for sentencing on these charges.

### III.    Objections to the Presentence Report and Grounds for Variance related to the Sentencing Guidelines

### A.  Factual Disputes

Because there was no plea and Mr. Smith proceeded to trial, there is no agreement as to the factual allegations. Mr. Smith has objected to the Probation

---

[1] For example, in *United States v. Denney* the government acknowledged that it looked for receipts to prove what was purchased and pointed to the texts discussing the various types of vests to argue that the particular vest purchased was a bullet-proof vest. Similarly, in *United States v. Sandlin*, the government provided evidence of items purchased on Amazon as well as text messages between Sandlin and others demonstrating he purchased numerous weapons and protective gear before coming to the District.

Office's recitation of the facts which was provided by the government and is not entirely consistent with Mr. Smith's recollection of either the events or the facts proven at trial. He understands that the Court will accept as facts that which the Court rendered in its verdict. Mr. Smith nonetheless notes the following specific corrections and objections[2]:

**Paragraph 21**: Mr. Smith was wearing his coat. He did not wear a "military style" jacket for any reason other than it was his jacket – it even had his name patch on it. He brought a selfie stick and radio with him, but he did not bring the stun gun with him but acknowledges that he had it when he entered the tunnel. He also acknowledges that in its verdict the Court did not find this plausible.

**Paragraph 23**: Mr. Smith did not open the door, other rioters did. As the Court said "At approximately 2:31 another rioter, not Mr. Smith, opens the middle door to the scaffolding. Mr. Smith then runs over from where he was standing. . ." Transcript of Verdict. And for the last sentence, it should read "An officer . . . commanded the defendant to get back from the door and he did not exit the area. Instead, he told the officers there are a million and a half people out there, you don't think we can get through the door.?"

**Paragraph 26-27 and 31**: Recognizing that the Court found otherwise, for the record, Mr. Smith does not concede these facts as true.

---

[2] At the time of this writing, the final PSR had not been prepared. Counsel includes herein the factual disputes expected to remain at the time of sentencing.

**Paragraph 24:**  A more accurate way to say this (consistent with the Court's verdict) would be: "Shortly thereafter, Mr. Smith climbed the Southwest Scaffolding to reach the lower west terrace." Mr. Smith did not directly follow the officers up the steps and the "harassment" occurred much earlier – see paragraph 22.

**Paragraph 25**: A more accurate way to say this (consistent with the Court's verdict) would be: ". . . Mr. Smith entered the tunnel, observed the chaotic scene around him and immediately moved toward the front of the mob where he joined the crowd in a collective effort to push against the officers in an attempt to overwhelm and break through the police line."

**Paragraph 28**: A more accurate way to say this (consistent with the Court's verdict) would be: "After Zach Rash passed the stun gun to another rioter, Mr. Smith exited the tunnel. . ." (See Transcript of Verdict and paragraph 27 - Mr. Rash took the stun gun from Mr. Smith's hands, he did not pass it to him.)

**Paragraph 30**: It is important to note that Mr. Rash pleaded guilty and in his plea agreement the government did *not* seek an enhancement for using a dangerous or deadly weapon or aiding and abetting an individual who used a dangerous or deadly weapon. (Dkt. 18, p. 3). Mr. Rash's statement of offense noted:

> After receiving the stun gun, Rash immediately turned towards the wall in the Tunnel and inspected the stun gun in his hand. At approximately 2:53 p.m., and *seconds after receiving it, Rash lunged toward officers and activated the stun gun. Approximately 20 seconds later, Rash lunged at officers again with the stun gun. At approximately 2:54 p.m., Rash passed the stun gun to another rioter and exited the Tunnel. This rioter handed the stun gun to another rioter who retained the stun gun and used it against other officers defending the Capitol.*

Dkt 19, p. 6.

## B. Objections to the PSR's Guidelines Calculation

### 1. The aggravated assault guideline, USSG § 2A2.2, should not apply to any count.[3]

The PSR applies the aggravated assault guideline. Mr. Smith maintains that the appropriate guideline is 2A2.4 as this was not an aggravated assault as defined by the sentencing guidelines. USSG § 2A2.4(c) only notes that a defendant convicted of assaulting a federal officer under 18 U.S.C. § 111 should be sentenced under §2A2.2 if the defendant's conduct constituted aggravated assault.[4] Mr. Smith's conduct did not constitute aggravated assault. The commentary to the aggravated assault guideline defines aggravated assault as

> a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony. Cmt.

This does not apply to Mr. Smith's conduct.

### 2. The Official Victim Enhancement of 6 levels overstates his culpability

Even if a 6-level enhancement is applied pursuant to U.S.S.G § 3A1.2 because the victim was a government official, consideration of a variance is

---

[3] Mr. Smith concedes that the D.C. Circuit has ruled against the defense on this issue in 2 separate cases, *United States v. Sargent*, 2024 WL 2873106 (D.C. Cir. June 7, 2024) and *United States v. Stevens*, 2024 WL 3211587 (D.C. Cir. June 28, 2024) but raises this issue to preserve it.

[4] "Aggravated Assault" is defined in §2A2.2 application note 1. *See U.S. v. Hooker*, 997 F.2d 67, 39 Fed. R. Evid. Serv. 443 (5th Cir. 1993) (pointing a cocked and loaded firearm at the victim's head, while kicking him and deciding where to kill him, constitutes aggravated assault as to trigger §2A2.2)

appropriate because that enhancement typically applies when there is an animus towards a government official. Mr. Smith was convicted on a theory that he aided and abetted the attempted assault by another person. He was not predisposed to be motivated by the officer's status, he did not directly commit the assault himself.

The applicable guideline provides in full: (Apply the greatest):

(a) If (1) the victim was (A) a government officer or employee; (B) a former government officer or employee; or (C) a member of the immediate family of a person described in subdivision (A) or (B); and (2) the *offense of conviction was motivated by such status*, increase by 3 levels;

(b) If subsection (a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offense Against the Person), increase by 6 levels.

(c) If, in a manner creating a substantial risk of serious bodily injury, the defendant or a person for whose conduct the defendant is otherwise accountable – (1) knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense or immediate flight therefrom; or (2) knowing or having reasonable cause to believe that a person was a prison official, assaulted such official while the defendant (or a person for whose conduct the defendant is otherwise accountable) was in the custody or control of a prison or other correctional facility, increase by 6 levels. U.S.S.G § 3A1.2. (*Italics added*)

In the commentary, the Commission explains in pertinent part that "motivated by such status," means that the offense of conviction was motivated by the fact that the victim was a government officer or employee. *Id*. cmt. n.3. The Commission goes on to provide an example "where both the defendant and the victim were employed by the same government agency and the offense was motivated by a personal dispute." *Id*. A 6-level increase would be dramatic, and its application in this case would over emphasize the importance of the victim's status in the actions taken.

### 3.  Mr. Smith Did Not Brandish or Use a Dangerous Weapon

As noted in the sentencing disparity section the definition of a dangerous weapon has been less than uniformly applied in these cases, leading to sentencing disparities. This precise item was found NOT to be a dangerous weapon in the *Gossjankowski* case and did not result in an enhancement in the *Rash* case. Moreover, this Court convicted Mr. Smith while noting that the stun gun or sparkler did not have to be a dangerous weapon capable of injuring an officer to have caused an assault – it merely had to have appeared to be. In this case, not only is there a question of whether the item was a dangerous weapon, but there is also a significant question as to whether Mr. Smith "brandished" that weapon. Merely passing it to another does not equate to brandishing or using a weapon.

### 4.  Mr. Smith is Entitled to an Application of the Zero Point Offender Guideline.

There is no dispute that Mr. Smith is a zero-point offender. He was not given a reduction pursuant to this section of the guidelines because his crime included a 111(a) charge. But he himself did not commit violence with an intent to injure.

Effective November 1, 2023, the United States Sentencing Commission created a new guideline provision relating to criminal history at U.S.S.G. § 4C1.1, Adjustment for Certain Zero-Point Offenders. Section 4C1.1 provides for a two-level decrease from the offense level for defendants who did not receive any criminal history points so long as they meet certain criteria. In this case, the only criteria at question is whether the defendant used "violence or credible threats of violence in connection with the offense." U.S.S.G. § 4C1.1(a); see also United States Sentencing Commission,

Amendments to the Sentencing Guidelines (Apr. 27, 2023), at 87-88 (Part B, Subpart 1).

The zero-point offender adjustment should be applied to Mr. Smith. Mr. Smith did not himself engage in violence or threaten violence. And that is what matters in assessing whether 4C1.1 applies.

The Sentencing Guidelines Manual itself does not define the term "use violence or credible threats of violence" within § 4C1.1 or its commentary. And when no definitions are provided, courts look to dictionary definitions to determine meaning. *See Kaufman v. Nielsen*, 896 F.3d 475, 485-87 (D.C. Cir. 2018). Courts in this district have issued several opinions discussing dictionary definitions of violence when considering § 4C1.1 and found that violence is "'[t]he use of physical force, typically 'accompanied by fury, vehemence, or outrage,' and 'unlawfully exercised with the intent to harm'" or the "exertion of any physical force so as to injure or abuse." *Bauer*, 2024 WL 324234, at *2 (*quoting* Violence, Black's Law Dictionary (11th ed. 2019), and Violence, Webster's Third New International Dictionary (1993)); *see also United States v. Yang*, No. 23-cr-100 (JDB), 2024 WL 519962, at *4 (D.D.C. Feb. 9, 2024) (similar); *United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 5 (D.D.C. Jan. 31, 2024) (similar).

Courts in this District to have addressed the issue have found that § 4C1.1(a)(3)'s violence exception requires the defendant to have *personally* used violence or made credible threats of violence to be disqualified; it is simply not enough that Mr. Smith was part of a group where *others* engaged in violence or made credible

12

threats of violence. *See, e.g.*, *Yang*, 2024 WL 519962, at *4 (rejecting the government's violence-by-presence theory of § 4C1.1(a)(3) after finding the "inquiry turns on the actions of the defendant himself or herself, not the actions of others," and "join[ing] the view of at least six other judges in this District," including Judges Kollar-Kotelly, McFadden, Friedrich, Mehta, Howell, and Boasberg). *See also*, *United States v. Joshua Doolin*, 21-CR-447-3 (CJN) Dkt. 313 (adding Judge Nichols to the list of judges who concur); *United States v. Paul Orta*, 24-cr-146 (DLF); *United States v. Fuller*, 23-cr-209-03 (CKK), Dkt 89.

Judge Bates' written opinion in *Yang* is instructive. There, Mr. Yang "stood near the front of the crowd close to the police line" in the Rotunda. *Yang*, 2024 WL 519962, at *1. While Mr. Yang's "body language was generally nonconfrontational," he made "physical contact with officers twice." *Id.* First, "[w]hen a scuffle broke out nearby . . . Yang briefly grabbed an officer's wrist." *Id.* Second, "[w]hen an officer approached from the side and pushed [another rioter] firmly with a baton, Yang . . . briefly grabbed the baton as [the other rioter] fell backward." *Id.*[5] The government further represented that Mr. Yang "push[ed] back against the officers" and "remained at the front of the mob clashing with the officers," *id.* at 12.

---

[5] According to the government's sentencing memorandum, "When police officers formed a line to expel the rioters from the Rotunda, Yang refused to move back or to leave, and instead, obstructed the officers. Yang pushed back and physically grabbed the arm of one officer, and when another officer pushed Yang towards the exit, Yang confronted the officer and waved his hand in his face instead of leaving. He remained near the advancing police line, and when an officer used his baton to push another rioter back, Yang physically grabbed hold of that officer's baton and interfered with the officer's attempt to clear the Rotunda. Yang finally exited the U.S. Capitol building at approximately 3:15 p.m., having been inside for roughly 30 minutes." *Yang*, No. 23-cr-100, ECF No. 34 at 2.

Judge Bates concluded that Mr. Yang's actions did not constitute "violence" within the meaning of § 4C1.1. *Yang*, 2024 WL 519962, at *4. Yang "stood near the front of the crowd close to the police line. While his body language was generally nonconfrontational, he made physical contact with officers twice." He grabbed a police officer's wrist and grabbed the baton of an officer as he was pushing another rioter away. The Court found that while Mr. Yang may have used physical force in that "he briefly made physical contact with two officers, the Court [found] that this contact was not made with an intent to harm." *Id.* As the Court explained, "[t]he throughline of the definitions of 'violence' is a degree of aggressiveness that [wa]s not present in th[at] case." *Id.* And, even though Mr. Yang was "near the front of the line opposing the line of officers," and twice made physical contact with officers, the Court concluded that "Yang did not act with the degree of aggression necessary to fairly characterize his actions as 'violence.'" *Id.*

Similarly, in *Orta*, the government conceded that the Yang standard was appropriate,[6] but argued 4C1.1 did not apply because of two incidents – one, his pushing of the metal bicycle barricade against officers and second, his subsequent throwing of a Go-Pro or body worn camera at officers. The Court ruled against the government and applied 4C1.1.

> You can have the intent to impede and get around, but not necessarily the intent to hurt. And I don't know if just the natural and probable consequence of pushing on a barricade could cause injury is enough, whether you have to show the specific intent, I think, here to injure. . . So I do think

---

[6] The Court referred to the definition of violence as "the use of physical force typically accompanied by fury, vehemence, or outrage and unlawfully exercised with the intent to harm, also defined as the exertion of any physical force so as to injure or abuse." The government conceded this definition was appropriate. See Exh. 2 at p. 7.

that . . . there's got to be more than just aggression. It's got to be aggression plus a specific intent to injure. . . . I don't know that simply saying that you're pushing against a barricade and that's a dangerous object that could injure is enough.[7]

And this was the finding despite the fact that the Court specifically found that in that case there was "great aggression, great fury, great outrage, great physical force,[8]" and a throwing of an object.

Even if the Court believes that 4C1.1 does not apply, the rationale that underlies the provision supports a variance. The provision was enacted because significant research finds that zero-point offenders are unlikely to recidivate. The same applies in this case because of Mr. Smith's history and characteristics, despite the actions the Court found Mr. Smith took.

### 5.  The Enhancement for More than Minimal Planning is Inapplicable.

The Probation Office did not include this enhancement in the draft PSR, but the government objected and asked that it be added.  The defense objects and notes that while there might have been planning associated with coming to the rally, there was no planning with respect to the charged conduct. Mr. Smith did not have elaborate plans to go to the Stop the Steal rally. He posted an indication that he was going. That is not enough. Once he arrived at the Capitol, he did not meet up with anyone or coordinate any assaults with anyone. His conduct was rash, reckless, and

---

[7] Transcript at 34-36
[8] Id. at 37

admittedly dangerous *but it was not planned*. Regrettably, like so many others there that day, he became carried away by the frenzy of the crowd.

His conduct did not involve "more than minimal planning," warranting a two-level increase under USSG § 2A2.2(b)(1). For purposes of the guideline, "more than minimal planning" is defined as

> more planning than is typical for commission of the offense in a simple form. 'More than minimal planning' also exists if significant affirmative steps were taken to conceal the offense, other than conduct to which §3C1.1 (Obstructing or Impeding the Administration of Justice) applies. For example, waiting to commit the offense when no witnesses were present would not alone constitute more than minimal planning. By contrast, luring the victim to a specific location or wearing a ski mask to prevent identification would constitute more than minimal planning.

Cmt. 2.

Smith's offense does not meet the definition of more than minimal planning in any respect. He did not engage in any planning more than that required for the commission of the offense. Other assault cases in which the enhancement was approved are in instructive here. In *United States v. Foster*, 898 F.2d 25 (4th Cir. 1990) the Fourth Circuit affirmed the more than minimal planning enhancement where the defendant, after catching his partner in bed with another man, took the following steps:

> Foster then took a metal gas can off [his girlfriend] Mrs. Tatum's porch and drove to a convenience store where he purchased a gallon of gasoline and an electrical extension cord. Foster returned to the Tatum residence where he cut the ends off of the extension cord and stripped some of the cord to expose bare wires at both ends. Under cover of night, Foster attached two of the wires at one end to two spark plugs in Brown's car. Foster next splashed gasoline around the back seat of the interior of Brown's car. Foster connected the two wires at the other end and placed them in the gasoline remaining in the can.

16

*Foster* at 26. The Fourth Circuit, noting that the defendant took multiple steps to make a bomb and then hid the bomb under a pile of clothes in the victim's car, found the offense involved more than minimal planning for purposes of USSG § 2A2.2(b)(1). In another case involving assaultive conduct, the Fourth Circuit affirmed the application of the enhancement were the defendant, a detainee in a local jail, "mixed a solution of baby oil, hand lotion, and water in a cup and heated it in a microwave" and threw the mixture in another detainee's face. *United States v. Hashi*, 318 Fed. Appx. 241 at 243 (4th Cir. 2009).

Mr. Smith's offense did not involve any of the planning steps that the courts found persuasive in *Foster* and *Hashi*. He did not engage is extensive planning to go to the Capitol, he did not coordinate a meet-up with anyone, he did not bring weapons with him when he did decide to go, and he did not engage in any conduct to conceal his conduct.

Comparing this case to another January 6 case in which more than minimal planning was applied further demonstrates its inapplicability here. In *United States v. Scott Miller*, 22-cr-412 (TSC), the government sought and obtained the enhancement for more than minimal planning when Miller chatted with other proud boy recruits for weeks to attend the Capitol; purposefully brought equipment with him to make it easier to engage in violence and prevent the application of tear gas by police (ski goggles, thick gloves with reinforced knuckles, etc.), encouraged his fellow Proud Boys to dress incognito to avoid detection, and covered his face with a gaiter to avoid detection. He did not travel to attend the rally but instead went directly to the

US Capitol as planned by the Proud Boys, a group he was part of. In that case, the government cited *United States v. Hatchett Speed*, 22-cr-244 (TNM), where the Court referred to the coordination with the Proud Boys and planning with them to be an aggravating factor, but the Court did not find that to be more than minimal planning.

Similarly, this Court found the more than minimal planning enhancement applied in *United States v. Lucas Denney*, 22-cr-70 (RDM), but that case is different in many respects. Mr. Denney was actively recruiting others, shopping for needed supplies including protective gear and pepper spray, fundraising for the efforts – both for supplies needed and for hotel expenses, and apparently coordinating with members of the Proud Boys. He also posted online his intent to "occupy congress, along with photos of the capitol building and "betrayal." He said there was "something going on that I can't tell you about, but we're planning it." He sought donations indicating he was coordinating with the Proud Boys and had an organization of at least seven other individuals. He also communicated with the Proud Boys over arrangements for hotel rooms. Dkt. 83, p. 16-17. Two days before January 6, he said "Things are going to be happening here. Trump is going to be speaking to everyone before everyone marches to the Capitol." And after sending that message he attempted to recruit others and acquire helmets, protective body gear, and pepper spray. *Id.* at 19. The government argues that this demonstrated that he was planning for violence, recruiting his comrades in arms, fundraising for himself and others. And he declared he would livestream when he was not fighting. *Id.* at 35-37. These actions were far more indicative of more than minimal planning – an enhancement rarely

used in the January 6 cases except perhaps for members of the Proud Boys and Oath Keepers who were planning the events. In the end, the Court imposed a sentence of 52 months.

Regardless of the guideline range this Court calculates, Mr. Smith, through counsel, respectfully submits that, consistent with the principle articulated by the Supreme Court that "the punishment should fit the offender and not merely the crime," *Pepper v. United States*, 562 U.S. 476, 477 (2011), this Court should impose a sentence well below the guidelines, followed by a period of supervised release with those conditions the Court deems fit to impose.

### IV.    Application of the Sentencing Factors

### A. Mr. Smith's History and characteristics demonstrate that a below guidelines sentence is appropriate.

Mr. Smith is a 38-year-old man. He was raised by his parents with his two sisters, and the family is close. He has a prior marriage and he and his ex-wife have a 15-year-old daughter who lives with her mother in Alabama. He shares custody with his ex-wife and, prior to his incarceration, paid child support and spent time with his daughter.

Mr. Smith is now married to Laura Smith who works for the Department of Army. They have two pre-teen daughters. He also has an 18-year-old son who was living with him but has now moved back to live with his mother.

Mr. Smith lived in New York until he enlisted in the military. He enlisted in 2004 and was honorably discharged on August 31, 2010 [see EXHIBIT 2, p.4]. While

serving in the military, he was stationed at ties in Alabama, Colorado, Georgia, Texas, Tennessee, Oklahoma, Iraq, and Korea. He was the 15R helicopter crew chief and received numerous medals, awards, and commendations: Iraq Campaign Medal with campaign stars, Army Commendation Medal, Army Achievement medals, Meritorious Unit Commendation, Army Good Conduct Medal, National Defense Service Medal, Korean Defense Service Medal, Army Service Ribbon and Overseas Service Ribbons.

After his honorable discharge in 2010, he was a maintenance supervisor for L3 Vertex in Iraq and then was a maintenance supervisor in Colorado Springs. He then served as a quality control/quality assurance inspector at various locations and a repair station airframe and power plant mechanic. In 2017, he became a senior systems quality engineer for the US Department of Army, until he was terminated because of this offense.

Mr. Smith and his family have lived in Alabama since 2014. He completed Federal Aviation Ground School and was a certified Federal Aviation Administration aircraft inspector and maintenance technician but lost his certifications because of his conviction in this case.

Several of Mr. Smith's friends, family members, and former colleagues have echoed Mr. Smith's important role as a leader and a mentor, as well as a respected and loved member of his family and community. These testimonials, included in EXHIBIT 1, from people who know Mr. Smith in an entirely different context than the unique and limited events of January 6 show that his acts that day were an

aberration for someone widely known to be law abiding and empathetic toward others.

As noted in the PSR, paragraph 76, the family has been struggling since his arrest in this case. He was the primary source of income for the family and was very involved with his children as well as his church.

As the Court is aware, Mr. Smith has suffered from edema in both his legs since April 2024. He has not seen a cardiologist as recommended but has been given medication at the jail. He has a number of other injuries and conditions as noted in the PSR. He also suffers from PTSD and was diagnosed at the VA clinic in Alabama. While he did not seek treatment for depression and anxiety during the pendency of this case, it appears that he suffered from both and was unable make progress on his case during the time he was pro se because of that condition.

## B. The nature and circumstances of the offense are serious but do not warrant the sentence the government requests.

This Court has already seen the evidence against Mr. Smith and has rendered a verdict accordingly.  The defense wishes to point out the following mitigating factors, some which the Court may have already been shown at trial:

Mr. Smith assisted law enforcement by preventing a potential assault

At 2:30pm, as Mr. Smith stood in front of law enforcement, another man (James Davis, 21-cr-595-TJK) began to lunge at Officer G.D. with a large wooden stick.  Mr. Smith yelled at Davis and grabbed him by the arm, pulling him back and away from law enforcement and then leading him back into the crowd.

21





Immediately after, Officer G.L. (a government witness in Mr. Smith's trial), addressed Mr. Smith directly, saying, "I appreciate that. Thank you!"[9]  James Davis, a member of the Proud Boys, would prove to have violent intentions, as he then moved further down the line, and away from Mr. Smith, where nobody stopped him from having violent encounters with multiple officers.[10]

### The significance of the southwest door as a barrier has been exaggerated

The government implies that Mr. Smith's actions at the southwest door led to protestors overtaking the scaffolding and subsequently the southwest steps and lower west terrace.  Although his actions impeded law enforcement from doing their duties, Mr. Smith played an insignificant role in allowing others to breach the area.  The actual door did very little to prevent anyone from entering. The following images illustrate the layout of the door and scaffolding, clearly showing that protestors could enter from all sides.[11]

---

[9]  Trial Transcript, 5/7/2024 at 44-45.

[10]  According to the government, Davis "wielded a long wooden stick as he directly confronted police officers. He first pushed against a police officer's riot shield with his left hand, which was holding the stick. Davis then moved toward a second officer, pushed back against the officer's outstretched baton, put his hand on the officer's shoulder, and yelled at the officer as the officer attempted to repel Davis. Davis only stopped after experiencing an apparent medical issue and collapsing. He later sent a long message to his fellow Proud Boys bragging that he was at the front of the line imploring the rioters to move forward, and claiming that he used his "beefy stick" to force the police to retreat." James Davis was sentenced to only 2 months incarceration following a guilty plea to Civil Disorder, notwithstanding the government request of 8 months.

[11] Images are taken from earlier in the day on January 6th, when the area was more clearly visible and unobstructed by the crowd.





<u>Mr. Smith did not open the southwest door:</u>

Mr. Smith did not open the SW door leading to the scaffolding which is supported by police body worn camera and was also observed and acknowledged by

this Court, "[At approximately 2:31] another rioter, not Mr. Smith, opens the middle door to the scaffolding…"[12]



Mr. Smith admonished assaultive behavior by others:

While Mr. Smith stood at the doorway, another protestor threw an object at law enforcement. Mr. Smith turned and pointed and yelled in the direction where the object had been thrown from.



---

[12] Verdict transcript, p.51

<u>Mr. Smith did not force officers to retreat and he did not follow them immediately up the steps</u>.

Law enforcement began retreating when others began pouring into the scaffolding area from both the north and south sides.  When officers retreated, they left the door open and Mr. Smith did not follow them.



Protestors continued infiltrating the area, mostly from the south side, but still not through the door.



Mr. Smith acknowledges that he eventually climbed the scaffolding to advance to the lower west terrace. He does not deny this. But the door was not the initial breach point, and he certainly was not among the first to advance.

<u>Mr. Smith did not hand the stun gun to Zachary Rash</u>

Defendant Zach Rash (24-cr-298-RDM) grabbed the stun gun out of Mr. Smith's hand. Although Mr. Smith had been attempting to hand the stun gun to others, he was not trying to give it to Zach Rash specifically. And this is important because Rash is the person who according to the government, lunged at officers with the stun gun.  This is confirmed in PSR, ¶27:

> *"...defendant Zach Rash grabbed the stun gun from his hand"*

and is further noted by the government in their arrest statement for Zachary Rash:

27

*"Smith waived the stun gun and offered it to other riots in front of him… Rash… reached for the stun gun and took it from Smith."*[13]

It was again confirmed by the government in a press release dated April 2nd, 2024:

*"In Capitol building closed-circuit television footage (CCTV), another rioter is seen removing a stun gun from his pocket and sparking it to ensure that it was operational. After this rioter ensured that the stun gun was operational, the rioter waived the stun gun and offered it to others. Rash then reached for the stun gun and took it."*[14]

Finally, video evidence demonstrates that Rash grabbed the stun gun from Mr. Smith while Mr. Smith was clearly trying to give it to someone else.



As Zach Rash was still grabbing the stun gun from Mr. Smith, a protestor behind them sprayed chemicals over their shoulders, preventing Mr. Smith from seeing who took it out of his hand. And he certainly didn't know what Zach Rash did with it after that.

---

[13] Statement of Offense, ECF 1

[14] District of Columbia | Utah Man Arrested for Assaulting Law Enforcement and Other Charges During Jan. 6 Capitol Breach | United States Department of Justice



Viewed by Jody_Fassbinder@fd.org (dcfpd.us.evidence.com) on 05 Nov 2024

<u>Mr. Smith never advanced to the front line inside the tunnel</u>

Due to the positioning of the surveillance camera inside the tunnel, CCTV video implies that Mr. Smith reached the "front of the mob" when he reached the edge of camera range. But this is inaccurate. The tunnel is much longer than what can be seen in range of the surveillance camera. Tunnel surveillance camera 0074 (actual camera shown circled below) points outward, toward the archway, not downward:



Therefore, the camera captures only a small portion of the tunnel, seen below[15]:



---

[15] Image taken from CCTV video on January 6th prior to the arrival of the crowd, for the purpose of providing an unobstructed view of the wall and the railing, showing camera range starting just in front of the second railing bracket.

The red line in the image below shows the approximate cut-off point of the surveillance video within the tunnel (everything to the left of the line is visible in CCTV; everything to the right of the line is not visible in CCTV).



The defense further notes that Mr. Smith does not appear in any body worn camera video of the officers at the front line – because he was never close enough to any officers to be in range.

<u>Mr. Smith left capitol grounds early</u>

At 3:35pm, approximately 17 minutes after exiting the tunnel, Mr. Smith left the lower west terrace, and then exited capitol grounds. He left on his own accord. He

was not forced out by law enforcement. The images below show Mr. Smith leaving through the SW scaffolding doorway at 3:35:20pm.[16]



As this Court is likely aware, the "tunnel fight" continued long after Mr. Smith left, and it only ended when the National Guard, Arlington County PD arrived to assist MPD and finally forced the crowd out of the tunnel and off the lower west terrace after 5pm.

Mr. Smith left when thousands of others stayed to participate in and/or observe the continued chaos, which sets him apart from so many other offenders. The following image shows the west side of capitol grounds at 3:36pm, when Mr. Smith was leaving:

---

[16] Left side image taken from surveillance camera 0682 at 3:35:20pm; right side image taken from Exhibit 627 which aligns with CCTV to confirm time of day.



At the trial, the government quoted Facebook posts that Mr. Smith made in November and December. And while those posts were a bit hyperbolic, they were not threatening. He did express to Officers during the day that they were on the wrong side and should be supporting the efforts of the protesters. But, he did not threaten those officers nor did he personally or directly assault them.

At trial, the government proceeded solely on an aiding and abetting theory on the 111(a) charge, on the theory that he aided and abetted the person who used the "stun gun" by handing it off to that person with the intent that it be used against officers and did so while engaging in civil disorder. The government abandoned the 111(b) theory. While Mr. Smith did possess what is being called a stun gun, he did not "brandish it" and did not "use it".

A lengthy period of incarceration would be overly punitive when other methods of punishment are available.

> People are all very quick to suggest that the only real punishment is a jail sentence, and it's just not true. People can suffer in many different ways and do suffer in many different ways a result of their conduct and that is something every judge, at least on this court, I believe, understands, and takes into account when they're fashioning the appropriate sentence.[17]

Following any term of incarceration, Mr. Smith will continue to be monitored on supervised release with restitution obligations, which, to be clear, are in and of themselves forms of punishment. *See Mont v. United States*, 139 S. Ct. 1826, 1834 (2019) ("Supervised release is a form of *punishment* that Congress prescribes along with a term of imprisonment as part of the same sentence.") (emphasis added); *United States v. Haymond*, 139 S. Ct. 2369, 2380 n. 5 (2019) ("[T]he sword of Damocles hangs over a defendant every time he wakes up to serve a day of supervised release."); *Gall v. United States*, 128 S. Ct. 586, 595-96 (2007) (noting that even a non-custodial sentence imposes serious restrictions on one's liberty and constitutes punishment, not a "free pass"); *see also United States v. Cohen*, 459 F.3d 490, 496 (4th Cir. 2006) ("[R]estitution is [...] part of the criminal defendant's sentence.").

The collateral consequences that attend to Mr. Smith's felony conviction cannot be overstated. District judges have recognized the life-long,

---

[17] Quote from the Honorable Amit P. Mehta, *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at pg 29.

damaging impact of a felony conviction can be relevant to sentencing. *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at pg. 29. Similarly, in imposing a variant probationary sentence, Judge Frederic Block of the Eastern District of New York issued a written opinion on the relevance of collateral consequences to his sentencing determination and urged that judges "consider such consequences in rendering a lawful sentence." *United States v. Nesbeth*, 188 F. Supp.3d 179 (E.D.N.Y. 2016). Judge Block wrote:

> There is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants after they have completed their court-imposed sentences. Many—under both federal and state law—attach automatically upon a defendant's conviction. The effects of these collateral consequences can be devastating. … Myriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of civil death and send the unequivocal message that "they" are no longer part of "us."

188 F. Supp. at 3d at 179 *(*internal quotations, alterations, and citations omitted*)*. In *Nesbeth*, the defendant was also a first offender, convicted of importation of drugs. Though that defendant's guideline range was 33-41 months, Judge Block "rendered a nonincarceratory sentence. . . in part because of the number of statutory and regulatory collateral consequences in balancing the 18 U.S.C. § 3335(a) factors." *Id.* at 180. *See also United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) (despite guidelines of 78-97 months, district judge imposed sentence of twenty months in part because conviction "made it doubtful that the defendant could pursue his career as an academic or translator, and therefore that the need for d

further deterrence and protection of the public is lessened because the conviction itself already visits a substantial punishment on the defendant"); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (loss of the defendant's "teaching certificate and his state pension as a result of his conduct" is appropriate sentencing consideration consistent with requirement that "the sentence reflect the need for just punishment and adequate deterrence").

The collateral consequences that Mr. Smith has already experienced and will continue to experience are severe and should be considered by this Court in assessing what would constitute a "just punishment" and "adequate deterrence." He has not only lost his job but has lost his vocation. The loss of his licenses will forever bar him from returning to his career.

With respect to deterrence, it is often presumed that incarceration is necessary to achieve deterrence, and that the more incarceration imposed, the greater the deterrent effect. However, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[18] In short, there is little empirical support for the prospect that a period of

---

[18] Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006) ("Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."); *see also* National Institute of Justice, *Five Things About Deterrence*, at 1 (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf (stating, among other things, that "[i]ncreasing the severity of punishment does little to deter crime," and "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment"); Ellen Raaijmakers *et al.*, *Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected

confinement will be any more effective at deterring Mr. Smith or others from

committing this offense. And, indeed, the most effective deterrent is the certainty of

punishment, not the severity of punishment. *See, e.g., United States v. Bannister*,

786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011) ("[G]iven that effective deterrence arises

from certainty, not harshness, of punishment, our society might better consider

whether our scarce resources would be better spent, not on extended incarceration,

but on eliminating social conditions encouraging crime and on non-incarceratory

techniques").

C. **A sentence below what the government is seeking would avoid unwarranted disparities.**

With respect to promoting respect for the law, a sentence below what the

government has requested will promote respect for the law. Similarly situated

January 6 cases have received considerably less than what the government is

seeking in this case in most, but not all, cases. And even those who personally

engaged in assaultive behavior and committed assaults under 111(b) have received

---

*Element in Testing Deterrence Theory*, 54 J. OF RSCH. IN CRIME AND DELINQ. 1, 4
(2017) ("[T]he available evidence points toward a null or a slightly criminogenic
effect of imprisonment but has rarely found support for a clear specific deterrent
effect."); Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUST.
199, 201 (2013) ("[T]here is little evidence of a specific deterrent effect arising from
the experience of imprisonment compared with the experience of noncustodial
sanctions such as probation. Instead, the evidence suggests that reoffending is
either unaffected or increased."); Zvi D. Gabbay*, Exploring the Limits of the
Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8
Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is
empirically known to be a far better deterrent than its severity").

sentences below what the government is seeking here. A sampling of the most serious cases with similar conduct follows:

*United States v. Michael Asbury (23-cr-236-RC)*

As this Court is aware, Zach Rash took the stun gun from Mr. Smith and then used it by activating it while lunging towards officers.  Zach Rash was charged with assault and has pleaded guilty before this Court. Mr. Smith has also been convicted of assault (aiding and abetting) for the actions of Mr. Rash.

During Mr. Smith's trial, this Court carefully reviewed the evidence and accurately acknowledged that the stun gun transferred from Smith/Rash was the same stun gun that was later passed by another man to Vitali Gossjankowski:

> *"The individual wearing the blue knit hat [RASH] eventually passes it to another individual with a beige knit hat [ASBURY] who passes it to the fourth man in the bright blue jacket [GOSSJANKOWSKI]."[19]*

> *"…And it also appears to be the same device that the man in the blue hat [RASH] hands to the man in the beige hat [ASBURY]…"[20]*

When this court described the passing of the stun gun, the individual described as wearing the blue knit hat has since been identified as Zachary Rash; and the fourth man described as wearing the bright blue jacket has been identified as Vitali Gossjankowski.  It is now known that the individual in the beige knit hat (the person who passed it to Gossjankowski) is defendant Michael Asbury.

---

[19] Verdict transcript, p.71. [names in brackets added by defense for clarification]
[20] Verdict transcript, p.72 [names in brackets added by defense for clarification]



After Asbury handed him the stun gun, Vitali Gossjankowski used it on a USCP Officer. For these actions specifically, Gossjankowski was originally charged with assault using a deadly and dangerous weapon. A jury found him guilty on the lesser charge of assault. Michael Asbury (the man who passed the stun gun to Gossjankowski) played the same role as Mr. Smith – he was responsible for the stun gun ending up in the possession of a man who used it to assault law enforcement, though he himself did not commit the actual assault directly.  However, unlike Mr. Smith, Asbury was not charged with assault nor was he charged with aiding and abetting.  He pleaded guilty to only Civil Disorder. And similar to Mr. Smith, Asbury participated in the "heave ho" efforts inside the tunnel (though according to the government, Asbury did this "at least three times."[21] which is more than Mr. Smith).

---

[21] Government Sentencing Memorandum, ECF 52

Asbury was sentenced to four months incarceration notwithstanding the government request of 11 months.

*United States v. James Mault (21-cr-657-BAH)*

According to the government, "During the riot, [James] Mault encouraged police officers to stand aside and allow the rioters to invade the Capitol Building while it was still occupied by Members of Congress. When the vastly outnumbered officers refused to give way, Mault and [co-defendant] Mattice led the mob that penetrated the police line in the West Plaza, forcing officers to retreat to the Lower West Terrace. Later, with great personal effort, Mault made his way to the mouth of the Lower West Terrace tunnel and used chemical spray against the police officers who refused to yield to Mault and his confederates. Mault then obtained another canister of pepper spray that he gave to another rioter who used it to attack officers in the tunnel."[22]

Like Mr. Smith, Mault was responsible for another rioter obtaining a weapon which was then used to assault law enforcement. *Images below show Mault handing a spray can to another rioter; and that rioter using it to assault law enforcement:*

---

[22] Government Sentencing Memorandum, ECF 61



This action in itself is arguably more egregious than Mr. Smith's actions in the following ways: Mault had been standing at the tunnel watching this other rioter use various weapons against law enforcement (Mault knew this riotor's intentions); and Mault directly passed the spray can to the other riotor (it wasn't grabbed out of his hand). But most importantly, even before this, Mault had *directly* assaulted officers by using a different spray can on law enforcement, reaching deep into the tunnel from an elevated position and dispensing the contents of the spray by holding down the button for a full ten seconds. Furthermore, Mault lied to the FBI following January 6th, and then illegally re-enlisted in the army by failing to mention his criminal charges from January 6th on the military security clearance application. Mault pleaded guilty to assault. At his sentencing hearing, the focus was largely on Mault's direct assault on officers. The passing of the second spray can to another riotor was only briefly mentioned once, and what happened with the spray can after that was not discussed at all.[23]  Mault was sentenced to 44 months incarceration.

---

[23] Transcript of Sentencing, ECF 79

*United States v. Justin Jersey (21-cr-35-RC):*

Similar to the previously cited case, Justin Jersey also handed a weapon to another rioter which led to assault of an officer. Jersey went to the Capitol carrying a gnarled wooden stick that was approximately four feet long and several inches thick. Jersey was approached by another rioter (Jonathan Mellis, *21-cr-206-RDM*) at the tunnel who told him to "knock their masks off." Jersey then handed the stick to Mellis who "wielding the stick like a sword stabbed at the faces and heads of officers at least five times, violently striking Officers D.P. and L.M. in the face, head, neck, and body area" before eventually throwing the stick at officers inside the tunnel. [24] Like Mr. Smith, Jersey was indirectly responsible for another rioter's assault against law enforcement. Unlike Mr. Smith, Jersey was well aware of the other rioter's violent intentions when he handed him the weapon. And also unlike Mr. Smith, Justin Jersey himself went on to assault officers directly, participating in one of the most aggravated assaults on January 6th. After passing off his stick, Jersey assaulted Officer A.W. by knocking him to the ground and grappling with his baton. Jersey then grabbed another baton and struck at other officers at the tunnel archway. Meanwhile, Jersey's co-defendants further assaulted officer A.W. (who was still lying on the ground after being knocked down by Jersey) by beating him with multiple objects, resulting in immediate hospitalization for a head laceration requiring staples to close. Finally, Jersey stole an officer's helmet which he displayed proudly as a trophy in a bar near his home. For all this, Justin Jersey was sentenced to only 51 months

---

[24] Government Sentencing Memorandum, Jonathan Mellis (21-cr-206-RDM), ECF 62

incarceration notwithstanding the government request for 63 months. At Jersey's sentencing hearing, the act of handing off a stick to another rioter was hardly mentioned.  The subsequent violent assault committed with that stick was not discussed at all.[25]  Perhaps it was merely an afterthought given Jersey's own deplorable actions.

The following below guidelines sentences on assault charges have been imposed by this Court specifically:

*United States v. Alan Byerly (21-cr-527-RDM):*

Alan Byerly was charged with assault (111b) for assaulting several officers with a stun gun, but pleaded guilty to assault (111a) and striking another person (113) for assaulting a reporter. According to the government, Byerly engaged in three separate assaults-- he activated a stun gun on one police officer and when it was taken by officers, he physically struck them and pushed against them, grabbing an officer's baton, he assaulted a group of officers using an enormous all metal Trump billboard with sharp edges that was capable of splitting someone's head open as a battering ram, and viciously assaulted a member of the press, dragging him up and down the staircase. As the government described it, "Byerly grabbed the victim with both hands near the victim's shoulder and upper chest and pushed him backward. Byerly then pushed and dragged the victim past the site of the original altercation and towards a dense crowd. Byerly eventually

---

[25] Transcript of sentencing, ECF 407

placed both of his hands in the area of the victim's face and neck and continued to shove and push the victim away from the stairs, and toward a low stone wall that separated the stairs of the West Front of the Capitol Building from the west lawn below." A weapon enhancement under 111(b) was not applied. The government requested 46 months incarceration, a sentence at the top of his guideline range of 37-46 months, noting the following: "Byerly committed three separate assaults on January 6, 2021, two against different police officers at different times and places, and one against a news reporter. His stipulated Guidelines range, however, is no higher than it would have been had committed only a single assault."[26]  This Court sentenced Byerly to 34 months incarceration. This comparison is important because unlike Mr. Smith, there was actual evidence that Byerly purchased and brought his own stun gun to the capitol  -- the government provided proof that the the stun gun was purchased by Byerly at a Cabela's store, and then used himself to charge at officers while brandishing the weapon. Byerly's actions were far more egregious and his sentence should be considered to avoid disparities.

*United States v. Jorden Mink (21-cr-25-RDM):*

According to the government, "[Jorden] Mink climbed onto an exterior window ledge of the Capitol armed with a baseball bat. Mink proceeded to violently and repeatedly strike a window with the bat, causing the window to shatter and fall into the building. Mink then entered the Capitol through the window and removed property, to include chairs, delivering them to rioters on the exterior of the building.

---

[26] *Id.*

Still on his violent rampage, Mink continued his journey and assaulted police officers in the Lower West Tunnel, by spitting on them, throwing items at them, and repeatedly striking them with a flagpole."[27] Much like the previously cited Mault case, Mink's action of handing out makeshift weapons (furniture) to others pales in comparison to his other far more egregious actions of multiple direct assaults on law enforcement. When Mink passed out pieces of furniture, he was handing them to people directly outside of the tunnel archway. Had the government followed up on the use of this furniture by others, surely they would've found instances of the furniture being used as weapons to assault officers.  Two such example are Thomas Ballard who threw a tabletop into the police line at the tunnel; and Josiah Kenyon who, according to the government, "used a table leg with a protruding nail to strike an officer in the leg and then to strike a second officer on the head such that Kenyon's weapon became lodged in the officer's face shield and helmet…[28]" Jorden Mink pleaded guilty to the 641 charge (Theft) and the 111b charge (assault with a deadly/dangerous weapon).  Transcripts were not available to counsel, but the assumption is that Mink was sentenced for his direct assaultive actions (which were clearly far worse than anything Mr. Smith did) and was not held accountable for aiding and abetting other assaults which resulted from the furniture he provided to others. This Court sentenced Mink to 51 months incarceration notwithstanding the government's request for 64 months.

---

[27] Government sentencing memorandum, ECF 86
[28] Government sentencing memorandum, Josiah Kenyon (21-cr-726-CJN), ECF 32

## United States v. Douglas Wyatt (23-cr-215-RDM):

Douglas Wyatt is another example of a defendant that handed a weapon to another rioter who then used it to assault law enforcement. Wyatt picked up a 4"x4" wooden plank and passed it off to his co-defendant who then hurled it at the police line striking USCP Officer J.W. in the head and causing him to briefly lose consciousness.[29] Like Mr. Smith, Wyatt indirectly participated in assault.  And similar to other cases cited, Douglas's actions were otherwise worse than Mr. Smith's. Aside from assisting his co-defendant in assault, Douglas himself pulled bike racks away from officers, then rushed the line and approached the inaugural stage where he rustled through a police duffle bag and stole a chemical spray gun which he then sprayed at law enforcement at close range.  This Court sentenced Douglas Wyatt to 46 months incarceration notwithstanding the government's request for 51 months.

## United States v. Matthew Miller (21-cr-75-RDM):

Miller pleaded guilty to assault (111a) and obstruction (1512) after he threw beer cans and batteries at officers, and unleashed the contents of a fire extinguisher on more than a dozen officers as other rioters were assaulting them. The same fire extinguisher was then retrieved by defendant Robert Palmer who emptied the remaining contents on law enforcement and later threw the same fire extinguisher at police.  Matthew Miller was sentenced to 33 months incarceration notwithstanding the government's request of 51 months.[30]

---

[29] Government Sentencing Memorandum, ECF 50
[30] Government Sentencing Memorandum, ECF 67

*United States v. Lucas Denney (22-cr-70-RDM):*

Denney, a former military police officer and the self-declared President of a militia group called the Patriot Boys of North Texas ("PBONT"), pleaded guilty to assault (111b) without a plea agreement after deploying pepper spray at officers and assaulting them with a pole, brandishing a baton, and pushing a riot shield into officers and swinging at an officer who had become separated from the police line. He wore full battle attire and repeatedly confronted police officers, beginning at the West Plaza at the metal bike racks making multiple attempts to pull the barricades from the officers and kicking it into officers. Then, he sprayed pepper spray at the officers on multiple occasions and then threw his canister at the officers; he subsequently swung a long pole at another officer, launched a large tube toward other officers. He later joined the rioters at the Lower West Terrace carrying a baton or stick in his hands. Then, he swung his fist at Officer MK, grabbed him in an attempt to pull him down the stairs. After the attack, he lied to the FBI agents about his involvement and deleted information from a social media account. Denney was associated with the Proud Boys and Three Percenters and before January 6 recruited people to his militia group and to participate in the events of January 6 which he expected to be violent. He specifically sought out people who would be willing to engage in violence to join him and solicited donations to pay for protective gear and pepper spray. According to the government, he sought out battles at BLM Plaza the night before the rally.[31] The

---

[31] ECF 46, Government Sentencing Memo.

government requested a sentence in the mid-range of the sentencing guidelines, which turned out to be 64 months incarceration (Denney's guidelines were determined at sentencing to be 57 to 71 months imprisonment.[32]). This Court sentenced him to 52 months, which was below the guidelines and well below the government's original request.

_United States v. Bruno Cua (21-cr-107-RDM):_

Cua, armed with pepper spray and a stolen baton, attacked a police officer inside the US Capitol building who was attempting to lock the doors to the Senate gallery. After assaulting the officer, Cua then rushed into the gallery, jumped down to the Senate floor and sat in the Vice president's chair with his feet up on the desk. He then opened another door, allowing dozens of other rioters onto the floor. Cua then rifled through multiple desks belonging to US Senators but not before using his jacket to attempt cover the lens of a nearby surveillance camera. Cua was convicted of two felonies (111a and 1512) in a stipulated bench trial and was sentenced to 12 months +1 day. There were of course other mitigating factors that the Court considered, but the Government had requested 57 months imprisonment.[33]

_United States v. Landon Copeland (21-cr-570-RDM):_

Copeland pushed and fought with law enforcement on the west front, south of the media tower and then used a bike rack to assault officers. The government requested a sentence of 52 months and he was sentenced to 36 months.

---

[32] Transcript of Sentencing, ECF 83
[33] ECF 328, Government Sentencing memo

<u>*United States v. Michael Lockwood (23-cr-146-RDM):*</u>

Lockwood elbowed an officer on the Lower West Terrace. He grabbed that same officer and wrestled with him, attempting to take his baton. After obtaining it, he took it home and posted pictures of the baton and bragged about having a souvenir. The government sought 27 months and he was sentenced to 12 months and one day.

<u>*United States v. Jamie Buteau (21-cr-489-RDM):*</u>

Buteau pushed chairs inside the area of the crypt to keep the automatic doors from closing. He threw a chair at law enforcement and hit one of the officers. The government sought 42 months and he was sentenced to 22 months.

<u>*United States v. Jonathan Mellis (21-cr-206-RDM):*</u>

Jonathan Mellis discussed previously in this memorandum as having received a gnarled stick from Justin Jersey and then violently assaulting officers with that stick was sentenced by this Court to 51 months incarceration notwithstanding the government request for 60 months.

<u>*United States v. Joseph Fischer (23-cr-305-RDM):*</u>

Fisher pleaded guilty to 8 charges, including assault and civil disorder without a plea agreement Fisher entered the Capitol and while inside, watched as an officer tried to apprehend a rioter. When they approached, he grabbed the officer and pushed the officer while another rioted shoved him from behind. He also grabbed a chair and

rammed it into the officer.[34] The government sought a sentence of 46 months and the Court sentenced Fisher to 20 months.[35]

## United States v. Luke Hoffman (23-cr-329-RDM):

Hoffman confronted officers at the mouth of the Lower West Terrace tunnel. He aggressively pulled a bike rack fence away from officers and then assaulted another officer by grabbing his police baton. He later sprayed OC spray at an officer. He was wearing a tactical vest and gloves and carried a can of OC based spray and a knife. He pleaded guilty to two 111(a) charges and agreed that a dangerous weapon was used. He got the benefit of not having to plead to 111(b).[36] The government sought 51 months and the Court sentenced Hoffman to 20 months.[37]

## United States v. Patrick Montgomery (21-cr-46-RDM):

According to the government, Patrick Montgomery grabbed a baton and wrestled an officer onto the ground where he continued to fight for control of the baton, directly kicking the officer in the chest.  He then illegally entered the Capitol building where he traversed several floors of the building and was one of the first to enter the Senate Gallery after witnessing others assault the officers who were guarding it. Patrick Montgomery was arrested on January 17, 2021, originally on misdemeanors which were later superseded to include Obstruction and Assault. He successfully delayed his trial for over three years before being convicted of both

---

[34] Government Sentencing Memorandum, ECF 33
[35] Judgement, ECF 39
[36] Government Sentencing Memorandum, ECF 27
[37] Judgement, ECF 35

felonies (111 and 1512) in a stipulated bench trial before this Court.  The
government later moved to vacate the 1512 conviction following *Fischer*. During
trial, the Court described Montgomery's actions on January 6th as "aggressive and
highly confrontational." During closing arguments, Montgomery through counsel,
blamed the officer for Montgomery's own assault against him.[38] Montgomery also
has an extensive criminal history, most notably a weapons possession conviction
which occurred in 2021 just six weeks after this Court had set a condition of release
prohibiting such. This court sentenced Patrick Montgomery to 37 months
incarceration notwithstanding the government request of 41 months.

Other district judges have also imposed sentences below the government's
request and often well below the guidelines. Listed here are just a few of many such
assault cases:

- *United States v. Sargent*, 21-cr-258 (TFH): Sargent pleaded guilty to
  assault on a police officer (111a) and civil disorder (231), among other
  charges, and was sentenced to 14 months incarceration when the
  government requested 27 months. In addition to twice swinging at an
  officer, he recorded the scene on social media while boasting, "we got a
  clash of police going. . . Shit's getting fucking rowdy out here now. We
  got flash bangs."[39] After striking one officer, Sargent tried to strike
  another officer, but instead made contact with another protestor.  At

---

[38] Government Sentencing Memorandum, ECF 264
[39] *United States v. Troy Sargent*, 1:21CR258(TFH), Gov. Sentencing Memo, ECF. No. 70.

one point, that defendant bragged that he "duffed an officer in the face." He also told officers "fuck you guys, you guys are either with them or with us and repeatedly berated officers." After the riot, he repeatedly gleefully bragged about punching an officer. After his arrest, he lied to the FBI about his actions.[40]

- *United States v. Leffingwell,* 21-cr-5 (ABJ): Leffingwell, a 57 year old veteran who entered the Capitol at the Senate wing doors and chanted at officers standing before him to "join us" and then, when two officers tried to repel him and the crowd around him, struck both officers in the head, landing three blows, pleaded guilty to assault (111a) and was sentenced to 6 months when the government sought 27 months.[41]

- *United States v. Robert Palmer,* 21-cr-328 (TSC): Palmer pleaded guilty to assault (111b) and was sentenced to 63 months after repeatedly assaulting police officers throwing a wooden plank like a spear, spraying officers with a fire extinguisher which he later threw at them, and then attacked again, with a piece of scaffolding and a second fire extinguisher as well as a traffic cone.  (His sentencing range was 63 to 78 months rather than 46 to 57 months because he lost his credit for acceptance of responsibility after posting false narratives about January 6 on his fundraising website.)[42]

---

[40] *Id.*

[41] *United States v. Leffingwell,* 1:21CR5 (ABJ), ECF. No. 4.

[42] ECF 30, Government Sentencing Memorandum.

- *United States v. Devlyn Thompson*, 21-cr-461 (RCL): Thompson pleaded guilty to assault (111b) after exhorting officers to fight one on one, passing out riot shields to rioters encouraging them to use the shields as weapons against the officers, throwing a large box speaker at the police line, assaulting a police officer with a metal police baton, and remaining in the tunnel for more than 13 minutes. He was "among the first of the rioters to arrive on the inaugural stage and he was one of the last to leave. For these numerous assaults over an extended period, he was sentenced to 46 months when the government requested 48 months.[43]

- *United States v. Nicholas Languerand*, 21-cr-353 (JDB): Languerand, an individual who had prior assaultive and threatening conduct, pleaded guilty to assault (111b) after watching the violence for two hours before assaulting officers by throwing a piece of wood, a heavy black speaker, multiple sticks, and a large traffic cone, using a riot shield against the officers, and later bragging about and offering justifications for his violent acts, and was sentenced to 44 months when the government requested 51 months. Languerand also had an extensive arsenal when he was arrested, as well as writings deeply critical and menacing of the FBI and photos of the proud boys, three percenters, nazi iconography, etc. He posted that he had carried a

---

[43] ECF 30, Government Sentencing Memorandum.

firearm with him to the Capitol although there was no evidence that this was true.[44]

- *United States v. Kevin Douglas Creek,* 21-cr-645 (DLF): Creek, a former Marine who brought mace and a knife to the Capitol, pleaded guilty to assault (111a) after he pushed through the barricade and grabbed Officer JCM driving him back forcefully several feet, striking him in the face shield before letting him go (arguably a physical restraint) and shoved Officer RSE to the ground and kicked him. He also picked up a ratchet strap – a thick strap with heavy metal buckles and threw it at the officers.[45] He was sentenced to 27 months, the government's request.

- *United States v. Greg Rubenacker,* 21-cr-193 (BAH): Rubenacker pleaded guilty without a plea agreement to all ten counts, including obstruction (1512), civil disorder (213) and assault (111a) among other charges, and was sentenced to 41 months. According to the government, he was one of the first people to enter the Capitol, entered a second time after leaving, chased Officer Goodman through the Capitol, berating him and other officers, swung a water bottle at one officer's head and threw liquid on another officer.[46]

---

[44] ECF 34, Government Sentencing Memo.
[45] ECF 48, Government Sentencing Memorandum
[46] ECF 56, Government Sentencing Memorandum

- *United States v. Howard Richardson*, 21-cr-721 (CKK): Richardson bludgeoned a police officer three times with a long metal pole he brought to the Capitol, only stopping when it broke; less than 2 minutes later, he helped use an enormous metal Trump sign as a battering ram against police officers. He was sentenced to 46 months. There were however aggravating factors – he was on bail for illegal possession of a firearm on January 6; he made false representations to the Court during his plea hearing; and after his plea but before sentencing he was arrested again for aggravated assault and lied to the local police about his conduct.[47]

- *United States v. Mark Mazza,* 21-736 (JEB): Mazza, a veteran, pleaded guilty to assault (111b) and CPWL after he brought two loaded handguns with him to the Capitol. While armed with one of his guns (he apparently lost the other in the crowd and it was subsequently recovered from another rioter who assaulted an officer), he pushed against the officers in the tunnel, berated and assaulted officers with a stolen police baton and remained armed on the Capitol grounds for several hours. "With his left hand, Mazza struck with full force against MPD Officer P.N.'s ungloved hand." He then showed off his stolen baton and engaged in the "heave-ho" pressure while brandishing the baton against police in the tunnel. After he left, he engaged in

---

[47] ECF 35, Government Sentencing Memo.

numerous acts of obstruction including filing a false police report about how he lost his gun, filing off the serial number of the stolen police baton, and providing false information to the capitol police.[48] The government sought a sentence of 78 months citing the egregiousness of his acts, and he was sentenced to 60 months.

- *United States v. Adam Jackson,* 22-cr-230 (RC): Jackson pleaded guilty to assault on a police officer (111a) and was sentenced to 36 months of Probation with the special conditions of 12 months Home Detention and 52 weekends of Intermittent Confinement,[49] notwithstanding the Government recommendation of 41 months incarceration. Jackson hurled a large cone at officers, and then using a stolen police shield, and with a running start, he rammed the frontline officers, causing two of them to fall.[50]

- *United States v. Grayson Sherrill,* 21-cr-282 (TSC): Sherrill violently swung and struck an officer with a metal pole. He then roamed around inside the US Capitol building for 34 minutes, joining others in chanting "NANCY." Sherrill was sentenced to seven months incarceration.  The government requested 41 months.[51]

- *United States v. Thomas Hamner,* 21-cr-689 (ABJ): Hamner was one of the first to breach the fencing around the Capitol perimeter. After wrestling

---

[48] ECF 30, Government Sentencing Memo.
[49] ECF 86, Judgment as to Adam Lejay Jackson
[50] ECF 80, Government Sentencing Memo
[51] ECF 124, Government Sentencing memo

barricades away from police on the west front, he assisted others in hurling a 10x10 Trump billboard at police. Hamner pleaded guilty to assault on an officer using a dangerous weapon (111b) and was sentenced to 30 months incarceration, notwithstanding the Government recommendation of 84 months.[52]

- *United States v. Edward Rodriguez,* 21-cr-483 (DLF): Rodriguez pleaded guilty to assaulting officers with a dangerous weapon (111b). He was sentenced to 36 months incarceration when the Government requested 88 months. Rodriguez joined others in pushing against police on the west front and then spraying officers with bear spray, hitting at least one of them directly in the eyes and injuring at least eight officers with the chemical irritant. Many of the officers required hospital care and recalled extreme pain and injuries; some reported that the skin on their faces and hands began to peel off.[53]

- *United States v. Matthew DaSilva,* 21-cr-564 (CJN): DaSilva was charged with assaulting police officers (111a) amongst other charges including Civil Disorder (231). He used his flagpole to block a door in an attempt to keep law enforcement from exiting the Capitol building. He then went to the tunnel where he remained for over 2.5 hours during which time he engaged in assault of front line officers and attempted to wrestle riot shields away

---

[52] ECF 28, Government Sentencing memo
[53] ECF 62, Government Sentencing memo

from them.  At trial, Officer J.S. recalled the pain he felt when DaSilva pushed against him.  DaSilva's actions also caused another officer to lose balance, leaving him exposed to a flying desk drawer thrown by another rioter which hit him in the head.  DaSilva was convicted of six counts in a bench trial. The Government recommended 52 months imprisonment, the midpoint of his guideline range.  He was sentenced to 28 months.[54]

- *United States v. Brian Mock,* 21-cr-444 (JEB): Mock helped other rioters remove police barricades at the northern end of the West Plaza and committed four separate assaults against police officers. He pushed one officer to the ground and kicked or attempted to kick him. He threw a broken flagpole at another. He pushed a third officer in the back. Mock shoved a fourth officer to the ground, using both hands and all of his body weight to do so, leaving the officer vulnerable to the mob. Mock then stole two USCP riot shields and passed them back to other rioters. Mock was convicted in a bench trial on all 11 counts, including the assaultive conduct. The Government recommended a sentence of 109 months. Mock was sentenced to 33 months.[55]

- *United States v. Nicholas Brockoff,* 21-cr-524 (CKK): Brockhoff threw an unidentified item at police officers; assaulted multiple police officers in different locations using a fire extinguisher; obtained a police officer's

---

[54] ECF 111, Government Sentencing memo
[55] ECF 112, Government Sentencing memo

helmet, wearing it throughout his afternoon rioting; entered the U.S. Capitol Building through a broken window that led to a Senate conference room; and once inside the building kicked in a door to gain entrance into a different, locked Senate conference room, which allowed others to enter the room as well; and rifled through belongings in the Senate taking home writing on a Senate notepad.[56] Brockoff pleaded guilty to assaulting officers using a dangerous weapon (111b) and was sentenced to 36 months incarceration as opposed to the Government recommendation of 51 months.

- *United States v. Scott Fairlamb,* 21-cr-120 (RCL); Fairlamb pleaded guilty to assault (111b) and obstruction after entering the Senate Wing one minute after it was breached, screaming at the officers, armed with a police baton which he brandished. He shoved an officer and punched him in the face. He shoved the officer so hard that he fell into a line of rioters, after which he stuck his finger in the officer's face and punched him in the face shield.[57] After January 6, he both lied about and bragged about his activities. He was sentenced to 41 months when the government requested 44 months.

- *United States v. Duke Wilson,* 21-cr-345 (RCL): Wilson pleaded guilty to obstruction (1512) and assault (111a) and was sentenced to 51 months. He physically engaged in hand to hand combat with officers at the Lower West Terrace, punching, shoving and kicking them as well as trying to steal their

---

[56] ECF 55, Government Sentencing Memo
[57] ECF 50, Government Sentencing Memo

riot shields. He then picked up a several feet long PCV pipe and struck at the officers, striking at least two different officers, and threw it into the crowd of officers. Despite these actions, the government allowed Wilson to plead guilty to 111(a) which did not include holding him responsible for the assault with the PVC pipe as a dangerous weapon.[58]

- *United States v. Ricky Wilden,* 21-cr-423 (RC); Wilden, a member of the Proud Boys, assaulted numerous police officers with a chemical irritant while he wore goggles that he had brought with him and then threw the canister at the officers; he entered the Capitol. After January 6 he deleted Facebook messages and videos.[59]  He pleaded guilty to assault (111a) and the government sought 30 months. At the time of his sentencing, he had a pending charge for felony assault of his spouse with a deadly weapon and was using illegal substances while on release. Despite assaulting with a chemical irritant and the empty canister, he was not required to plead to the more serious assault charge and did not receive the dangerous weapon enhancement. He was sentenced to 24 months.

- *United States v. Marshall Neefe,* 21-cr-567-1 (RCL): Neefe pleaded guilty to obstruction (1512) and assault (111a) after he made plans to obstruct congress and then helped use the enormous metal Trump sign as a battering ram against police officers, then entered the Capitol building,

---

[58] ECF 29, Government Sentencing Memo
[59] ECF 36, Government Sentencing Memo

pleaded guilty to assault (111a) and obstruction (1512). According to the government, prior to January 6, Neefe had shared his intention to bring weapons and commit violence. He admitted to making a wooden club with an American flag stapled to it to use as a potential weapon. The Government requested sentence of 46 months (didn't include the weapon enhancement under 111b) and Neefe was sentenced to 41 months.[60] After the attacks, he celebrated his involvement.

- *United States v. Charles Bradford Smith,* 21-cr-567-2 (RCL): Smith pleaded guilty to obstruction (1512) and assault (111a). According to the government, he conspired with codefendant Neefe for two months to obstruct the certification of the election, planned and prepared for violence, and once there, assisted in hoisting the large metal Trump sign (described above) and used it as a battering ram assaulting at least three police officers; sentenced to 41 months when government sought a 44-month sentence.[61]

- *United States v Sandlin,* 21-cr-88 (DLF) Sandlin pleaded guilty to assault (111a) and obstruction (1512k) and was sentenced to 63 months. According to the government, Sandlin with his coconspirators DeGrave and Colt, substantially planned for their participation, bringing a car full of weapons, including knives, bear spray and a pistol fully anticipating violence;

---

[60] ECF 84, Government Sentencing Memo
[61] ECF 90, Government Sentencing Memo.

Case 1:23-cr-00071-RDM    Document 112    Filed 11/12/24    Page 62 of 69


Sandlin then directly assaulted at least 2 capitol police officers – attempting to rip off one officers helmet and taking a swing at another officer's head and assisted in the assault of at least 4 others, then, in the aftermath both celebrated his participation and tried to profit off of it and obstructed the investigation.[62]

- *United States v. Hernandez,* 22-cr-42 (CRC): Hernandez pleaded guilty to assault (111a) and civil disorder (231) after he climbed through the window at the Senate Wing Door, entered the speaker's conference room and senate gallery, he hit a door in the hallway with his flagpole, and attempted to enter where congressional staff were barricaded in an office, he then assaulted a police officer with his flagpole by hitting him in the head.[63] The dangerous weapon enhancement was not applied and he was sentenced to 24 months.

- *United States v. Douglas Jensen,* 21-cr-06 (TJK) was found guilty after trial before a jury of assault (111a), civil disorder (231) obstruction (1512) and other assorted misdemeanors and was sentenced to 60 months, after he entered the Capitol in the first wave and led a group of rioters menacingly chasing Officer Goodman towards the Senate Chamber, breached the Capitol a second time after exiting, and repeatedly riled up the crowd and threatened officers, while carrying a knife in his pocket. As officers tried to

---

[62] ECF 92, Government Sentencing Memo.
[63] ECF 32, Government Sentencing Memo

escort him out, he pushed and shoved them in a very agitated state.[64]

- *United States v. Philip Young,* 21-617 (DLF) Young pleaded guilty to all charges, including assault (111a) and civil disorder (231) without a plea agreement. The government requested a sentence of 40 months, and he was sentenced to 8 months. Early in the breach, Young rushed up the stairs, grabbed and lifted a barricade and pushed it into two MPD officers; after being forced back down the stairs, he pushed the barricade forward against the officers a second time. The government sought a dangerous weapon enhancement for the bike rack, but it appears the Court did not agree.[65]

- *United States v. David Judd,* 21-cr-40 (TNM): Judd was found guilty after a stipulated trial of obstruction (1512) and assault (111a). According to the government, Judd was fully aware of the certification process, intended to disrupt the activities of Congress before coming to D.C., and "acted as an on-the-ground commander of other rioters, directing, encouraging, and instigating the violence, chaos, and destruction in and around the tunnel . . . yelling commands to organize rioters, passing items into the tunnel to be used as weapons" etc. He then joined in coordinated pushes against the police line and lit a firecracker and threw it at the police line.[66] The government characterized his conduct as "some of the most aggravating

---

[64] ECF 107, Government Sentencing Memo
[65] Counsel does not have access to the transcript and is making this assumption based upon the sentence ultimately imposed.
[66] ECF 527, Government Sentencing Memorandum.

conduct that we've seen on January 6th."[67] The firecracker was found to be a dangerous weapon, and the Court found that Judd intended to cause bodily injury by throwing the firecracker, but the Court disagreed with the guideline range of 78 to 97 months proposed by the government and probation and found a range of 37 to 46 months and then varied downward to impose a sentence of 32 months, finding the "advisory guideline produces an advisory sentence that is overly harsh."[68] The government requested a sentence of 90 months and he was sentenced to 32 months.

- *Kaleb Dillard*, 23-cr-00049-JMC. Dillard grabbed an officer by the vest and slammed him onto the ground where the officer hit his head on the marble floor inside the US Capitol building. This officer suffered vertigo and dizziness for three months following January 6th, but "could not attribute his head injury to any particular moment during the riot." Dillard pleaded guilty to the 111(a)(1), was given a two-point bodily injury enhancement, and was sentenced to 10 months incarceration. Of note, Dillard also used a metal object to smash the window of the east Rotunda door and was one of the first people to enter the

---

[67] Transcript at p. 17; See also, Transcript at 26 (seeking a terrorism enhancement, the government represented 'the degree of his conduct was so great, and his intent was there so great, coupled with all of his other actions in the tunnel, which include directing the rioters, passing the shields in, passing the crutch in, telling people where to go, engaging in the heave-ho himself, this Defendant did it all, and he did it over the course of a long period of time."); Transcript at 53 ("looking at all of the January 6 rioters, I think this Defendant is at the high end of them also.)

[68] Transcript of Sentencing. The Court found the guideline range to be lower because of its reading of the 1512 guidelines.

building through the east side. He also shoved another officer away from the door which resulted in the mob flooding into the building.

- *Daniel Gray* (21-cr-495-ABJ). According to the Government, Gray (a former martial arts teacher) physically engaged with multiple officers, causing a female officer to fall down a set of stairs, hitting her head and cracking her bicycle helmet. The Probation Office in this case concluded that Officer M.B. suffered "serious bodily injury" as she stated that she suffered from post-traumatic stress disorder and continued to receive physical therapy for a pinched nerve. However, Officer M.B.'s medical records were not obtained, and therefore the defendant was given only a three-point injury enhancement. Daniel Gray pleaded guilty to two felony counts (1512 and 111a) and was sentenced to 30 months incarceration notwithstanding the Government recommendation of 51 months imprisonment.

Finally, the defense submits that the sentences pointed to by the government should not be used as a basis to determine Mr. Smith's sentence. In each of the three cases, the defendant *directly* assaulted *multiple* officers with malicious intent during some of the most violent and egregious attacks on January 6th:

<u>United States v. Kyle Young (21-cr-291-ABJ):</u>

Kyle Young passed a taser to another rioter which was later used to taze Officer Fanone in the back of the neck. A taser is a far more dangerous weapon than a stun gun, in that a taser uses projectile prongs that attach to a target up to 15 feet

away and is more effective at incapacitating muscle functions.[69]  Although this Court held that it did not need to find whether or not the stun gun passed by Mr. Smith was capable of causing harm because it was sufficient to cause someone to fear injury [Tr. 5/10/24, p.75], it has acknowledged in *Byerly* that the level of potential injury resulting from a stun gun or taser device was an important consideration.[70] But regardless of the nature of the device, Young went on to directly assault multiple officers which is something that Mr. Smith did not do. First Young threw a speaker at law enforcement inside the tunnel and then used a pole to jab at the police line.  Then, after Young's co-defendant had dragged Officer Fanone out of the tunnel, Young joined the attack on Fanone by restraining his wrist when he was at his most vulnerable – immediately after he'd been repeatedly tazed on the back of his neck and still reeling from the attack.  While Young restrained his wrist, others including his co-defendants attempted to further assault Fanone and successfully removed his police badge and radio all while the crowd yelled, "Kill him!" and "Get his gun!"  Finally, after he lost his grip on Fanone, Young moved on to the other officer who had been dragged into the crowd and assaulted him by grabbing onto his helmet and body, pushing him and hitting him. Perhaps one of the most aggravating factors in the Young case is that he did all of this in front of his 16 year old son who he brought with him to the rally, to the capitol, and inside the tunnel. Kyle Young's offense level included the

---

[69] Stun Gun vs. TASER: What's the Difference? | SafeWise
[70] Transcript of sentencing, 21-cr-527-RDM, ECF 57

enhancements of serious bodily injury as well as physical restraint. The government has noted that Young had a criminal history category of IV.

### United States v. Gillespie, (22-cr-60-BAH):

The government points to Vincent Gillespie who was sentenced for assault inside the tunnel. They note that Gillespie "used a riot shield to push against officers in an effort to force his way inside" and that Gillespie also "grabbed an officer's arm which interfered with the officers' ability to stop other rioters." But they do not elaborate on this attack to include that Gillespie used a shield to directly ram the police two different times, and then used two hands to directly grab a Sergeant in attempts to pull him out of the tunnel and into the mob while also restraining him while another rioter beat him with a crutch.

### United States v. Patrick McCaughey (21-cr-40-TNM):

The government points to the similarities between Mr. Smith and Patrick McCaughey, which are that the two both participated in the heave-ho efforts in the tunnel and that each used a weapon against law enforcement. They compare Mr. Smith's action of handing off a weapon (then used by a different person to assault an officer) to McCaughey's direct attack using a shield. But they do not provide details of McCaughey's assault, which are markedly more severe. McCaughey, after making his way to the rear of the tunnel with a stolen police shield, came face to face with Officer Hodges where he used the shield to pin him inside a metal door frame where he trapped him there for over thirty seconds allowing McCaughey's co-

67

defendants to lift his face shield, disarm him of his baton and then use the baton to strike him in the face, all while officer Hodges was bleeding, screaming in pain, and crying out for help. The video of the assault on Hodges was widely publicized and often included warnings to viewers of highly disturbing content.[71] Furthermore, McCaughey then assaulted a second officer by swatting his shield several times and then landing a blow on that officer's arm with his own stolen shield.  At trial, McCaughey took the stand and showed little remorse for his actions, consistently downplaying his involvement. Judge McFadden sentenced McCaughey to 90 months incarceration which was less than half of the government recommendation (188 months) and well below McCaughey's guideline range of 151-188 months.

### Objection to the Restitution

Because Mr. Smith did not enter into a plea agreement, this Cour has no authority to order restitution as the statutes governing restitution do not apply. "Federal courts do not have inherent authority to order restitution and may do so "solely pursuant to statute." *United States v. Anderson*, 545 F.3d 1072, 1077 (D.C. Cir. 2008); United States v. Fair, 699 F.3d 508, 512 (D.C. Cir. 2012). None of the offenses Mr. Smith has been convicted of are listed in 18 U.S.C. § 3663(a)(1)(A) or 3663A(c)(1), which authorizes the court to order restitution if the defendant violates one of the listed statutes. *Id*. In addition, he did not enter the Capitol, he did not break any windows, he did not damage any property and he did not cause any compensable harm to any law enforcement officers. Because he did not "actually

---

[71] [Disturbing video shows officer crushed against door by mob storming the Capitol | CNN](#)

cause" any of the alleged damages and did not enter into a plea agreement by which he agreed to pay a portion of the restitution, he is not liable for the damages alleged. *See United States v. Jabr*, 4 F.4th 97, 105 (D.C. Cir. 2021) (18 U.S.C. § 3663 "compensate[s] victims only for losses caused by the conduct underlying the offense of conviction."); see also *In re Sealed Case*, 702 F.3d 59, 66 (D.C. Cir. 2012) (defendant not required "to pay restitution for harm he did not cause"). *See Eric Christie*, 23-cr-005 (APM) (Court deferred on whether restitution was available without a plea or specific damage caused and no order of restitution followed).

## V.    Conclusion

Mr. Smith respectfully requests that the Court sentence him to a sentence well below that requested by the government. While he recognizes the Court's verdict, the guidelines overstate his culpability in comparison to others who have been convicted of violating 18 USC 111(a) and 231 in that he did not directly assault or make physical contact with an officer. For all of the reasons outlined above, we respectfully request a sentence below the guidelines.

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____  ____/s/_____
Michelle Peterson
Chief Asst Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500